JAMES MINTER et al., Trustees, v. ADALINE SHIRLEY.

1. INDIAN TRIBES — HOW REGARDED BY UNITED STATES IN REFERENCE TO LANDS OCCUPIED BY THEM. — The United States have recognized the Indian nations, as so far having the attributes of sovereignty, as to be capable of making treaties and being bound by them, and as having also such title to the country occupied by them as may be granted by alienation and cession to the United States.

2. SAME — RESERVATION OF A PART FROM THEIR CESSION — ITS EFFECT. — The cession of the whole was subject to the right to withhold certain parcels, which, when designated by a selection, were excluded from the grant, and held by the ancient title of the tribe quitclaimed and confirmed by the United States.

3. UNITED STATES DID NOT HAVE ABSOLUTE TITLE TO INDIAN LANDS UNTIL EXTINGUISHMENT OF THEIR TITLE BY CESSION. — The various Indian treaties and the acts of congress, show that the government never regarded the absolute title to the soil as vesting in the United States, as proprietors in fee, until ceded by the Indians; nor did they undertake to dispose of them by grants for charitable uses, or to individual purchases, until the acquisition of the Indian title.

4. SIXTEENTH SECTION UNOCCUPIED AND UNAPPROPRIATED — SUBJECT, LIKE OTHER LAND, TO LOCATION UNDER THE SECOND ARTICLE — SUPPLEMENTAL TREATY OF DANCING RABBIT CREEK. — The reservation by the second article of.the treaty of Dancing Rabbit Creek to Robert Jones, of the right to locate a section upon any unoccupied and unimproved land, gave him the right to locate upon a sixteenth section which was unoccupied and unimproved, and, his assignee receiving a patent from the United States to a sixteenth section, located by virtue of his claim, acquired a good title.

5. PATENT FOR LAND — EFFECT OF ITS RECITALS — EVIDENCE OF EXISTENCE OF THE CONDITIONS UPON WHICH ITS ISSUANCE DEPENDS. — The patent from the government to the assignees of Jones, "is evidence of the existence and due performance of the conditions upon which its issuance depends." It is evidence that the Indian was entitled to the "reservation," and that the land was regularly surveyed and located.

ERROR to the circuit court of Sunflower county. COTHRAN, J.

The plaintiffs, as school trustees, brought ejectment for the sixteenth section in township No. 2. north of range 1 west, in Sunflower county, against the defendant, Adeline Shirley; and also for the mesne profits of the same. Defendant had occupied the land ever since 1844, claiming it under the title of Robert Jones.

It is admitted that the land was unoccupied in 1833,

when surveyed by the government, and no board of school trustees had been organized in said township until 1857. Robert Jones, mentioned in the "Dancing Rabbit Creek Treaty," was proved to be a Chickasaw or Choctaw, and that he moved with the nation to the Choctaw country west of the Mississippi, and was seen there in 1847. Defendants offered in evidence a patent purporting to convey section No. 16, in dispute, as the section reserved for Robert Jones by the second article of the supplement to the treaty of "Dancing Rabbit Creek," to other persons than said Jones. To this patent plaintiffs objected, 1st. Because there was no law for the issuance of the same ; 2d. Because said patent was not issued to said Robert Jones, that it appeared that he was an Indian and there was no assignment by Jones.

*Thomas Walton*, for plaintiffs in error.

The act of congress of 23d August, 1842, sec. 8 (Lesler's Land Law, 76), provides that the patent for lands should be issued to the Indian, if living, who took under the "Dancing Rabbit Creek Treaty." The evidence shows that Jones, the Indian under whom defendant claims, was living when the patent issued to others ; the patent was therefore void. If this act is not the authority for issuing the patent, there is none to authorize it, and it is void as a patent to convey land. The operation of the fourteenth article of that treaty is confined to actual residents. The second article of the supplement provides for the location of the land granted to Robert Jones, by the Indian himself. The patent does not profess to have ever made such location. See Lodiza v. Roberts, 2 How. (U. S.) 591. The patent does not locate the land for the Indian ; it merely recites, as a reason for granting the lands to other persons than the Indian, that it appears, etc., that the president has approved the selection of the land for the Indian ; and the sale of his interest in the float to such other person. See Brooks v. Marsh, 8 How. (U. S.) 223 ; 17 Curtis' Abr. 565.

Was the sixteenth section liable at all to this location of

the float granted to Robert Jones by this treaty? The twelfth section of the act of Congress of March 3, 1803, "declares, that in all the lands aforesaid, section 16 shall be reserved in each township for the support of schools within the same." See Vincennes University v. the State of Indiana, 14 How. 274; Gaines v. Nicholson, 9 ib. 364. The act of May 20, 1826, Lester's Land Laws, 39, in section 1, speaks of lands previously reserved for schools, as having been "appropriated for that use." This is a statutory recognition that the act of 1803, was a grant *in presenti.* See Hestee v. Crisler, 36 Miss. 684; Dartmouth College v. Woodward, 4 Wheat. 518; Commonwealth v. Lessees of White, 6 Pet.; Barclay v. Howell's Lessee, 6 ib. 498. See, also, Town of Paulett v. Clark, 9 Cranch, 292; Wilcox v. Jackson, 13 Pet. 498; U. S. v. Brooks, 10 How; Marsh v. Brook, 14 Pet. 513; 8 ib. 233; Wray v. Doe, 10 Smedes & Marsh. 461; Coleman v. Tishomah, 4 ib. 47, 48; Newman v. Doe, 4 How.; Het-tuck-ho-mi v. Watts, 7 Smedes & Marsh. 363. All the doctrine of these cases is confirmed by the case of Cooper v. Roberts, 18 How. The title becomes completely vested in the township, and the land ascertained and interest fixed the instant the survey of the sixteenth section is made. See United States v. Fernandez, 10 Pet. 303; Johnson v. McIntosh, 8 Wheat. 574; Cornet v. Winston, 2 Yerg.; Lodiza v. Robards, 2 How. 591; Cherokee Nation v. Georgia, 5 Pet. 27; Breaux v. Johns, 4 La. Ann. 143; Brooks v. Norris, 4 Rob. 175. Accordingly we find that the grant of lands, either by direct words of grant or reservation, is held to have passed a good title, notwithstanding an Indian occupation of the land. Meigs v. McClurg's Lessee, 9 Cranch, 11; Clark v. Smith, 13 Pet. 195; Fletcher v. Peck, 8 Cranch, 87; Green v. Litee, 8 ib. 229.

Neither actual occupation, cultivation or residence are necessary to constitute actual possession. Ewing v. Burnett, 1 Pet. 53. See, also, United States v. Arredondo, 6 ib. 691; Hanna v. Renfro, 32 Miss. 125; Fairfax's Devisee

v. Hunter's Lessee; Picket v. Dowdell, 2 Wash. 106; Johnson v. Buffington, 2 ib. 116; Carey v. Burns, ib. 121; 2 Vattel, ch. 12, § 170; Newman v. Harris & Plummer, 4 How. 522; New Orleans v. Anna and Cucullu, 9 Pet. 223; Thompson v. Schlatee, 13 La. Ann. 119; Anding v. Davis, 38 Miss. 574; Bingham on Inf. and Covert. 101, 135, 136, note k.

*Geo. L. Potter,* for defendant in error.

The article of the treaty under which Jones claimed, provides that he might locate his section "on any unoccupied and unimproved lands." Rev. Code, 712, art. 2. The original treaty is dated 27th September, 1830; the supplement was made next day. They were ratified in February, 1831.

Upon the facts in proof, it is manifest the verdict is right, the patent is conclusive in account of law, unless the United States had previously granted the land to the plaintiffs. Exception is taken to the recitals in the patent, on the ground that they do not amount to positive statements; but this is a mistake. They are in usual official form. In this case the president officially approves the location, and afterward approves the sale made by the Indian; and when the patent was to be issued, transcripts of those records were furnished showing the facts, and the patent was issued accordingly. And the patent is conclusive evidence of title and of the truth of the facts recited. Sweatt v. Corcoran, 37 Miss. 517, 518.

It is evidence of the existence and due performance of all the conditions on which its issuance depended, that the Indian was entitled, that the land patented was regularly located. Harris v. McKissack, 34 Miss. 468, 469. It is evidence that all preliminary steps necessary to its issuance have been taken. Surget v. Little, 24 Miss. 118; 4 How. 13; Minter v. Commelin, 18 How. 88, 89. It is evidence of the location of this reservation on this section in due time, and when it "was unimproved and unoccupied,"

and also that Jones had duly transferred his interest to the patentees. 32 Miss. 151 ; 3 Kent, 491 ; Fletcher v. Peck, 8 Cranch, 87 ; Gaines v. Nicholson, 9 How. 365.

The United States, by assenting to this treaty, agreed that the tracts reserved are not public lands, but individual property. In the case of such reservation, the interest of the Indian nation, and whatever claim the United States may have, is settled in the reservee ; such lands never fall within the general land laws, never become public lands of that class from which only the sixteenth sections are reserved. The argument of counsel is, that the title of the people of the township is prior to the treaty. And yet all agree, that, by force of the Chickasaw treaty, there is no school section in that session. This court has held that the United States never owned the Chickasaw lands. They were reserved and appropriated by the treaty itself. Harris v. McKissack, 34 Miss. 469 ; see act of 1803 ; Rev. Code, 651, § 9, 652, § 12 ; Act of 1808 ; Rev. Code, 659, 660, § 5. The case of Hester v. Crisler, 36 Miss. 684, is conclusive against the pretense of plaintiffs as to the date of title, etc. The law of this court is, that the word "reservation" used in the treaty is equivalent to a grant ; and that it so operates, even in the case of reservations, which are to be "located," as was the reservation of Jones. Newman v. Harris, 4 How. 560.

The treaty was a general cession of the Indian territory ; but all of the reservations, whether general or special, were so much land excepted from the general cession and did not pass by it to the United States. Where the reservation was to be located, it was a grant of so much land out of the "unimproved and unoccupied" lands of the territory, precisely as a special reservation was a grant of a particular tract ; and when the location was duly made, the particular tract granted became identified as the land reserved, and also as part of the land to which the Indian title was not extinguished. Gaines v. Nicholson, 9 How. ; Opinions of the Attorney-General, vol. III, p. 56.

Simrall, J. :

The very interesting subject presented in this case is, whether the sixteenth section was subject to location by an Indian reservation under the Dancing Rabbit Creek Treaty.

The defendants in error derive title through Robert Jones, who, under the second article of the treaty, was entitled to locate a section upon any "unoccupied and unimproved land." The school trustees insist that the patent issued to the assignees of Jones is void, because congress had dedicated the sixteenth section for the promotion of schools and education in the township, and, therefore, it must not be subject to location.

The practice of the United States has been to regard the Indian tribes as *quasi* proprietors of the country in which they dwelt, resulting from their occupancy; but with an incapacity to alienate except to the national government. The right to acquire and extinguish their title pertained exclusively to the United States, therefore individual purchases, made from them separately, or as tribes, were null and void. This applied to all the public domain in which the ultimate sovereignty and proprietorship to the soil was in the United States. 3 Kent's Com. 492; Mitchel v. United States, 9 Pet. 711.

The United States have recognized the Indian nations as so far having the attributes of sovereignty, as to be capable of making treaties, and being bound by them; as having also such title to the country occupied by them as may be granted by alienation and cession. This practice was uniformly adhered to toward the Indian tribes of the southwest. The treaty of Hopewill, made the 3d January, 1786, defined the boundary between the Choctaws and the United States. The treaty of Fort Adams, concluded with the same tribe, December 17th, 1801, established the boundary, as previously agreed upon with the British commissioners, and "relinquished and forever quitclaimed to the United States," all their right, title and pretension to the lands bounded south by the 31st parallel of north latitude, and

north to the point where the boundary line, as defined in the preceding treaty, would strike the Yazoo river. Features of boundary and cession are contained in the treaty with the Chickasaws, of April 20th, 1816 ; the treaties with the Choctaws, of October 24th, 1816, and October 18th, 1820. Finally, the treaty of Dancing Rabbit Creek, of the 27th and 28th September, 1830, extinguished their title to all their lands east of the Mississippi river, except certain reservations therein made.

The several acts of congress, in reference to the survey and sale of the public lands, distinctly keep in view the fact "that the Indian title must first have been extinguished, and acquired by the United States, before individual right to any part of the soil can be derived and vest." Thus the act of March 3d, 1803, regulating the grants and disposition of lands south of the state of Tennessee, in its first section, directs, among other things, "all the lands in the Mississippi territory, to which the Indian title had been extinguished, to be surveyed."

The twelfth section provides for the sale of all the land thus surveyed, "except the sixteenth section, which shall be reserved in each township for the support of schools therein," except, also, a reservation for the benefit of Jefferson College, and other lands already granted. An addition to the foregoing statute was passed in 1806, authorizing the substitution of other lands in place of the sixteenth section, "where the same has already been granted by congress, or is claimed by a virtue of a British grant," that is, "the secretary of the treasury may locate another section in lieu thereof for schools."

Congress has devoted the sixteenth section in each township to the use of schools in all the territory ceded by Virginia and by Georgia to the United States. This is the general dedication ; but if, on account of a previous appropriation, or an executory obligation assumed by the United States, the grant cannot take effect on that particular section, then the like quantity may be selected elsewhere in the same

township.   Because of the impracticability of the grant in all cases taking effect on the sixteenth section, authority is given to locate a section on other lands.   Speaking on this point, in Cooper v. Roberts, 18 How. 178, the court said, "the fulfillment of the policy of the government partially defeated uniformity in the appropriation of the sixteenth section."   This language was used with reference to the northwestern territory, where other appropriations of land interfered.   In the same connection, remarking in reference to the southwestern territory, it is said, this "territory was similarly burdened in the compact of cession by Georgia, and similar paramount obligations have arisen in treaties with the Indian tribes who inhabited it."   When the political authorities have surveyed the township and designated the section, "if there be no legal impediment in the way," the dedication of the section to the charitable use becomes complete.   Gaines v. Nicholson, 9 How. (U. S.) 356; Cooper v. Roberts, 18 How. 178.

We have an example in the Dancing Rabbit Creek Treaty "of a paramount obligation resting on the government," which interposes "a legal obstacle to the reservation of the section in controversy for the use of schools."   Robert Jones, by the second article of the treaty, was allowed a reservation of one section, and, jointly with James L. McDonald, one section, "who may locate the same on any unimproved and unoccupied land."   There can be no difficulty by referring to other parts of the treaty in determining what is meant by "unimproved and unoccupied land."

Many of the Indians had made improvements.   Whenever a reservation was made in their behalf, it included the settlement and improvement.   Jones was not in that class; he is described as "not residing in the nation."   He, and others in the same catagory, that they might not interfere with another's improvement, were required to select unoccupied and unimproved land.

The only difference between the two classes of reservees is, that one is permitted to retain the "improvements;"

the other must make his selection of some section of the wild lands. The "right" of each, which is the equivalent of a grant, is created by the same words.

If, on a survey into township and sections, the sixteenth section should include an "improvement," which, by the treaty, was reserved to a particular Indian, it would seem to be quite clear, that the reservee would have a good title ; for the very parcel of land described and designated, is excepted out of the grant and cession to the United States; that proposition was ruled in Gaines v. Nicholson, 9 How. (U. S.) 356. The court, however, forebore to express an opinion, whether the same result would ensue, if a reservee had located his "float," (so called in common parlance) on a sixteenth section. The satisfactory reasoning by which the court came to the conclusion, that the reservation in the former case, would be paramount was, that the special tract did not pass by the treaty to the United States. It was carved out of, and reserved from, the grant. The same reasoning applies with equal force to the reservee who has retained to him by the treaty, a right to make a location. The covenant of the United States was that the reservee might place his float upon any lands within the ceded territory not "improved and not occupied." If the United States had desired to limit the range of selection, and to withdraw any portion of the ceded territory from the privilege of location, it would doubtless have been so nominated in the treaty.

The cession of the whole was subject to the right to withhold certain parcels, which, when designated by a selection, were excluded from the grant, and held by the ancient title of the tribe quitclaimed and confirmed by the United States. The United States had the power to deal with the lands occupied by the Indian tribes according to its pleasure. It could respect their title and pretensions, as they saw fit ; giving such validity and character as it pleased. But as the several treaties and acts of congress referred to show the government never regarded the absolute title to the

soil as resting in the United States, as the proprietors in fee, until ceded by the Indians. Nor did they undertake to dispose of them by grants for charitable uses, or to individual purchases, until the acquisition of the Indian title.

It was upon this principle and practice of the government, that the case in 9 How. (U. S.) was decided. If, before the Dancing Rabbit Creek Treaty was concluded, there had been a reservation, and dedication of a portion of this Indian territory for the support of schools, it could not have been decided that the reservee had a title superior to the beneficiaries of the charity. In Wilcox v. Jackson, 13 Pet. 498, it is said, "a reservation sets aside the thing reserved for some particular use. Whenever a tract of land shall be legally appropriated to any purpose, it becomes separated from the public lands." If the reservation be for a seminary of learning, or for the support of schools in a township, it is no objection, that, at the time of the reservation, there was no "seminary" in existence, or no inhabitants of the township who could be beneficiaries. In the mean time the title abides in the United States, to rest in trust so soon as there are those who may enjoy the use of the property. Vincennes University v. Indiana, 14 How. 274.

The territorial government for Mississippi, established by congress in 1798, extended to the people "all the privileges, rights and advantages" granted to the people of the northwestern territory, by the ordinance of July 3, 1787 (except the first clause of the sixth article, which prohibited slavery). The third article declares "that religion, morality and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged. The utmost good faith shall always be observed toward the Indian nations ; their lands and property shall never be taken from them without their consent." The policy of the national government, both on the subject of encouraging education and laying down a rule of conduct toward the Indian tribes, was thus marked

out by this celebrated ordinance before the adoption of the constitution. Congress has with fidelity fulfilled these injunctions, by appropriating the sixteenth section for local schools, and larger grants for seminaries of higher learning. The treaties which we have referred to show that good faith has been observed toward the Indians. The cession made by Georgia to the United States, of her vast domain, was burdened with obligations antecedent to the compact, which the United States engaged to observe. They also undertook, as might be practicable, to extinguish the Indian title and open the lands to sale and settlement.

Until survey by the United States, the right to the sixteenth section rests in compact, binding in good faith, depending for execution on the political authorities. The government, as we have seen, may incur such prior obligations as will defeat it altogether.

The statute of 1803, reserving the sixteenth section for schools, in terms only applied to lands to which the Indian title had been extinguished. The Choctaws and Chickasaws then occupied a very large portion of the territory embraced in the limits of this state. The line which divided the territory of Mississippi from the Indian country was at a point at or near the mouth of the Yazoo river. Prior to the extinction of the Indian title there was not a vested right either in the state or the inhabitants of a township to the sixteenth section. The United States, in her treaties of acquisition, might come under such stipulations and engagements as would defeat a reservation of the sixteenth section in some of the townships, while it would attach in others; or would defeat the reservation in the ceded territory altogether. The Dancing Rabbit Creek Treaty furnishes an example of the former. The treaty with the Chickasaws of 20th October, 1832, is a most noted example of the second. The first article cedes all the land owned by the tribe east of the Mississippi river; but the subsequent articles couple the grant, with the trust, that the United States shall survey and sell the lands, and pay over the net proceeds to their

use.   Those who chose to remain would select certain quantities of land and make locations.   The theory has never been advanced (so far as we know), that the townships within the area of this cession have any pretension of claim upon the sixteenth section.   Congress, however, very promptly redeemed its obligation, by substituting equivalent lands elsewhere.

It is believed that in the execution of these Indian treaties the government has uniformly permitted "reservees" to make locations on any sections, including the sixteenth section.   Such was the opinion given by the attorney-general to the officers of the land office in 1838.

We think that the treaty made in effect a grant, location, specified the tract upon which it operated.   When located, the "right" relates back to the treaty and becomes as complete as though the treaty had assigned a particular section.   Niles v. Anderson, 5 How. (Miss.) 382; Wray v. Doe, 10 Smedes & Marsh. 383; Harris v. McKisrick, 37 Miss. 469.

What virtue does the patent to the assignees of Jones have.   "It is evidence of the existence and due performance of the conditions upon which its issuance depends."   "It is evidence that the Indian was entitled to a 'reservation,' and that the land was regularly surveyed and located." Harris v. McKisrick, 37 Miss. 469.   The same objection urged to this patent was raised in Johnson v. Horne, 32 ib. 152, but without avail.   There the patent was said to be valid as to all persons who do not show a title derived from the reservee.   This disposes of the substantial questions touching the merits.   It is unnecessary therefore to consider the action of the court below in granting and refusing instructions to the jury.

Wherefore the judgment of the circuit court is affirmed.