## B. B. ROBERTS v. THE MISSOURI, KANSAS & TEXAS RAILWAY COMPANY *et al.*

1. OSAGE CEDED LANDS — *Right-of-Way* — *Exception.* The act of July 26, 1866, (14 U. S. Stat. 289,) gave a right-of-way over the Osage ceded lands, being lands reserved by the United States for the Great and Little Osage Indians; but such right-of-way extended over such lands only as had not previously been disposed of by the government.

2. SCHOOL LANDS — *Grant in Indian Lands.* The third section of the act of admission of the state of Kansas into the Union irrevocably granted to the state for the use of schools the sixteenth and thirty-sixth sections of the public lands, and that grant embraced those sections of Indian lands within the state in which the Indians had a right of possession only.

3. RIGHT-OF-WAY — *Act, Repealed Before Construction of Road.* Where a right-of-way is given to a railroad over certain lands by an act of the legislature, and afterward and before the location and construction of such railroad such act is repealed, *held*, that such railway company secured no right-of-way by the construction of its road over such lands after the act granting such right-of-way was repealed.

4. ————— *Void Statute.* Chapter 124 of the Laws of 1871 is void; being in violation of § 1, article 12, of the constitution.

## *Error from Labette District Court.*

EJECTMENT, by *Roberts* against the *Railway Companies*, to recover possession of certain lands occupied by defendants as a right-of-way through section 16, township 34, range 21, in Labette county. Trial by the court, and judgment, on November 2, 1887, for defendants. Plaintiff brings the case here.

*Case & Glasse*, for plaintiff in error.

*T. N. Sedgwick*, for defendants in error.

Opinion by CLOGSTON, C.: The land in question was originally Osage ceded lands. The plaintiff claimed title by virtue of a patent issued by the state of Kansas to J. A. Roberts, and by deed of conveyance from said Roberts to the plaintiff.

The defendants claimed title, first, by virtue of an act of congress, approved July 26, 1866; and second, by chapter 79 of the Laws of Kansas of 1864, and chapter 44 of the Laws of 1865, and chapter 124 of the Laws of 1871; and lastly, by virtue of the fifteen-years statute of limitation. It is conceded that the plaintiff is entitled to the possession of this land under his title unless the defendants had a right-of-way through the land by virtue of the statutes above cited, or by their adverse possession of fifteen years.

We shall consider these defenses in the order in which they are given. First, as to the act of congress under which the defendants claim, being §1, U. S. Revised Statutes, ch. 270, vol. 14: It is an act granting lands to the state of Kansas in aid of the construction of the southern branch of the Union Pacific railway and telegraph, from Fort Riley, Kansas, to Fort Smith, Arkansas; and after granting to the state certain lands, the alternate sections of lands or parts thereof designated by odd numbers, to the extent of five sections on each side of the road and not exceeding in all ten sections, with certain restrictions thereto as to rights acquired before the location of the road by preëmption and homestead settlement, etc., or to any land "reserved to the United States for any purpose whatever," then this proviso:

"*Provided*, that any and all lands heretofore reserved to the United States by any act of congress, or in any other manner by competent authority, for the purpose of aiding in any object of internal improvement or other purpose whatever, be and the same are hereby reserved and excepted from the operation of this act, except so far as it may be found necessary to locate the route of said road through such reserved lands, in which case the right-of-way, two hundred feet in width, is hereby granted, subject to the approval of the president of the United States."

Under this proviso defendants claimed a right-of-way through this land. As said before, this land was Osage ceded land, which was afterward conveyed to the government by treaty with the Great and Little tribes of Osage Indians, January 21, 1867. The defendants constructed their road

over this land, as shown by the findings, about June 6, 1870.
The plaintiff's title from the state bears date of May 25, 1871,
and since the construction of the road the defendants have
been in possession of the right-of-way up to this time.    The
statute above quoted was to give a right-of-way through lands
which the government had reserved, either by acts of con-
gress or in any other manner, for the purpose of
aiding internal improvements or for any other
purpose, and through such lands, and such lands
only, it granted to the railway a right-of-way;
and if the land in question falls within the list of lands ex-
empted from the operation of this statute, then the defendants
have a right-of-way so far as this one statute is concerned.
This land being Osage Indian land at the time of the passage
of the act of congress of July 26, 1866, was land reserved by
the government from the operation of that grant.    The grant
by its terms included all the lands reserved by the United
States for any purpose whatsoever.    Its broad terms included
Indian lands or lands given for their use; and in this particu-
lar exception to the act and grant of right-of-way, congress
must have had in mind these Osage lands, for they were lands
lying directly in the route of this contemplated road, and so
far as congress could do to aid the state of Kansas in the con-
struction of railroads, it was willing to do.    This was the
object of the statute, to aid in building roads in Kansas.    That
being its object, the right-of-way was a very important feature
of the aid to be given.    In construing the act of the 3d of
March, 1863, being an act to grant lands to the state of Kan-
sas to aid in the construction of railroads, the supreme court
of the United States, in *Leavenworth Rly. Co. v. United States*,
92 U. S. 733, said: "All lands 'heretofore reserved,' that is,
reserved before the passage of the act, 'by competent authority,
for any purpose whatsoever,' are excepted by the proviso."
This language is broad and comprehensive.    It unquestion-
ably covers these lands that had been reserved by treaty be-
fore the act of 1863 was passed.    It is said, however, that
having been reserved not to the United States but to the Osage

1. Right-of-way
over only such
lands as had
not been dis-
posed of.

Indians, they are therefore not within the terms of the proviso. This proposition is untenable. It would leave the proviso without effect, because all the reservations through which the road was to pass were Indian. This fact was recognized, and the right-of-way granted through them subject to the approval of the president. But the verbal criticism that these lands were not, within the meaning of the proviso, reserved "to the United States," is unsound. The treaty reserved them as much to one as to the other contracting party. Both were interested therein, and had title thereto. In one sense they were reserved to the Indians, but in another and broader sense to the United States for the "use of the Indians." (Also, see *Wolcott v. Navigation Co.*, 5 Wall. 681.) This proviso construed is exactly the same as the proviso to the act of July 26, 1866, and the subject-matter is the same lands, the Osage ceded lands; and therefore, having once received an interpretation by the supreme court of the United States, such interpretation must be followed by this court.

This brings us to the question whether the government of the United States had, prior to the act of July 26, 1866, disposed of any of these lands, over which a right-of-way is claimed, to the state of Kansas for school purposes. It is claimed by the plaintiff in error that by the act of admission of the state of Kansas, congress had by solemn compact with the state ceded to it the sixteenth and thirty-sixth sections of each township of public lands for school purposes, and that this compact included all the land in the state that belonged to the government, and that it attached to land in which the Indians had a possessory right, as well as to the public lands generally subject to sale and preëmption. Section 3 of the act of admission, paragraph 5, is as follows:

"That sections numbered sixteen and thirty-six in every township of public lands in said state, and where either of said sections or any part thereof has been sold or otherwise disposed of, other lands equivalent thereto and as contiguous as may be, shall be granted to said state for the use of schools."

The right of the United States to dispose of lands to which it holds the fee has ever been recognized by the courts of highest resort in this country, and this rule is true with regard to lands in which the Indians have a right of possession, as well as to the public lands belonging to the government. (*Johnson v. McIntosh*, 8 Wheat. 543; *U. S. v. Cook*, 19 Wall. 591; *Clark v. Smith*, 13 Pet. 195.)   The only limitation made by this act of admission was that land which had not been sold or otherwise disposed of should be granted to the state for school purposes.   Now these Osage lands were the property of the United States, and, as we said before, were subject to grant by the government.   The right and power to dispose of these lands rested with congress; and it having that power, then they were not otherwise disposed of, and were subject to the grant made to the state.   This compact was binding upon the government, and when made and accepted by the state became unalterable except by consent of the state.   By this act the government parted with these lands, and they were no longer subject to be disposed of for other purposes.   They were sacred to Kansas for the use of the public schools.   It is true that the Osage Indians had the right of possession, and this right

2. School lands in Indian lands.

of possession was as secure to them as that of the fee in the government, and when transferred to the state, as secure as the interest of the state; but this was a possessory right only, and one that might be terminated by the government at any time with the consent of the Indians. This the government did do, by treaty with the Great and Little Osage Indians, which was ratified January 21, 1867; and when that was done, the right of possession, as well as the fee through the government, passed to the state, of the sixteenth and thirty-sixth sections.   Up to that time it was a float.

*Beecher v. Wetherby*, 95 U. S. 517, was an action in replevin, brought by Beecher to recover from Wetherby certain sawlogs cut upon section sixteen, in Wisconsin; and the controversy arose between these parties, one claiming by patent from the state of Wisconsin, the state having sold the land as school

land, and the other claiming by patent from the United States. The land, prior to the admission of Wisconsin to the Union, was Indian land, and continued to remain Indian land for some eighteen months after the state was admitted.   In the act of admission there was granted to the state of Wisconsin the sixteenth section of each township of public land for schools, and the language is identical with that of the act of admission of Kansas, with the exception that it only included the sixteenth section, while that of Kansas included the thirty-sixth section as well.   In other respects they were the same. Speaking of this contract between the government and the state of Wisconsin, the court said:

"It was, therefore, an unalterable condition of the admission, obligatory upon the United States, that section sixteen in every township of the public lands of the state, which had not been sold or otherwise disposed of, should be granted to the state for the use of schools.   It matters not whether the words of the compact be considered as merely promissory on the part of the United States and constituting only a pledge of a grant in future, or as operating to transfer the title to the state upon her acceptance of the propositions as soon as the sections could be afterward identified by public surveys.   In either case, the lands which might be embraced within those sections were appropriated to the state.   They were withdrawn from any other disposition, and set apart from the public domain, so that no subsequent law authorizing a sale of it could be construed to embrace them, although they were not specially excepted.   All that afterward remained for the United States to do with respect to them, and all that could be legally done under the compact, was to identify the sections by appropriate surveys; or, if any further assurance of title was required, to provide for the execution of proper instruments to transfer the naked fee, or to adopt such further legislation as would accomplish that result.   They could not be diverted from their appropriation to the state."

In *Cooper v. Roberts*, 18 How. 173, the court said:

"We agree that, until the survey of the township and the designation of the specific section, the right of the state rests in compact — binding, it is true, the public faith, and dependent for execution upon the political authorities.   Courts of

justice have no authority to mark out and define the land which shall be subject to the grant. But when the political authorities have performed this duty, the compact has an object upon which it can attach, and if there is no legal impediment, the title of the state becomes a legal title. (*Fletcher v. Peck*, 6 Cranch, 127; *McGee v. Mathis*, 4 Wall. 145; *New Orleans v. De Armas*, 9 Pet. 224.)"

These decisions cover this case. In the Wisconsin case, the land was Indian land, set apart for the use of the Indians, as these lands in Kansas were set apart to the use of the Osage Indians. In each case the title was in the government; the right of possession in the Indians. In each case the government by compact with the state, by the act of admission, gave the state in one case the sixteenth sections, and in the other the sixteenth and thirty-sixth sections. This compact, having been recognized in Wisconsin and Michigan, and elsewhere, as attaching to all the lands in the state in which the government had not parted with its title, embraces all Indian lands; and when the Indian title is extinguished the lands pass to the state under this compact.

It is however claimed by the defendants in error, that, admitting the authority above cited to be correct, yet it is not applicable for the reason that the acts of admission of the states of Wisconsin and Michigan are different from the act of admission of Kansas, and that the proviso to section one of the act of admission of this state places a limitation upon the state to claim these lands. Section 1 of the act of admission reads:

"That the state of Kansas shall be, and is hereby declared to be, one of the United States of America, and admitted into the Union on an equal footing with the original states in all respects whatever. And the said state shall consist of all the territory included within the following boundaries: [Here follow the boundaries.] *Provided,* That nothing contained in said constitution respecting the boundary of said state shall be construed to impair the rights of person or property now pertaining to the Indians of said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians; or to include any territory which

by treaty with such Indian tribe is not, without the consent of such tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be excepted out of the boundaries, and constitute no part, of the state of Kansas, until such tribe shall signify their assent to the president of the United States to be included within said state; or to affect the authority of the government of the United States to make any regulation respecting such Indians, their lands, property, or other rights, by treaty, law, or otherwise, which it would have been competent to make if this act had never passed."

To say that this proviso is clear, and that there can be no doubt as to what congress intended by it, would be to claim too much.   The subject of this section was one of boundary and of jurisdiction; and these provisions were in relation to the boundary of the state, and excepting from its boundary and excepting from its jurisdiction, and not for the purpose, we think, of fixing or determining the grants to the state, or limiting such grants.   The next section following this provides in terms that no assent was given by congress to any of the propositions contained in the constitution submitted to congress, but that congress submitted in the act a proposition to the state, and these were specifically set out and numbered, and when adopted by the state, were to be obligatory upon the United States as well as upon the state; and the first of these propositions was the one under which this land was ceded to the state as school land, and to which the only condition attached was, that it was not to apply to land that had been sold or disposed of by the government.   This could mean nothing less than passing to the state all the title the government had to its land, of the sixteenth and thirty-sixth sections, within the boundaries set out in § 1.   At that time a large part of the territory of the state was claimed by the Indians; and that congress intended by this proviso to exclude from the state the sixteenth and thirty-sixth sections of the lands when the Indian title became extinguished, would have been a great injustice, and in opposition to the acknowledged policy of the government in the admission of new states in extending aid

for school purposes; and such a construction of this organic act will not be given as would violate and set aside the policy and custom of the government in dealing with new states.

But it is claimed by the defendants in error that, considering this land to be school land, then they were granted the right-of-way by the legislature of the state of Kansas, under chapter 79, Laws of 1864. This was an act accepting the grant of lands to the state made by congress in aid of certain railways and telegraph lines. Section 6 is as follows:

"The right-of-way upon and across all lands belonging to the state, to a distance of one hundred feet in width, together with the right to construct and use, upon such lands, all turnouts and water stations, is hereby granted to said companies, respectively, for the use of their respective roads."

At this time there was no road located or land designated by the defendants, and this title, whatever else it may have been, was a present grant to the railroad companies, and not a continuing or future grant. It could have no operation until the title and right of possession of the Indians was extinguished, which was not until January 21, 1867, when the treaty was ratified.

The next claim by the defendants is under chapter 44 of the Laws of 1865, and under §10 of that act. That was an act to provide for the incorporation and regulation of railway companies, under which defendant companies were organized and the road constructed. Section 10 is as follows:

"SEC. 10. Such corporation is authorized to enter upon any land, for the purpose of examining and surveying its railroad line, and may appropriate thereof as may be deemed necessary for its railroads, including necessary side-tracks, depots and workshops, and water stations, material for construction, except timber, a right-of-way over adjacent lands sufficient to enable such companies to construct and repair its roads, and a right to conduct water by aqueducts, and the right of making proper drains," etc.

This statute is broad enough to give railway companies a continuing grant, and would give them the right to a right-of-way over the lands of the state, as far as the state could

convey such right by act of the legislature, *in futuro*, and is broad enough to include lands acquired years after its passage and before the construction of the road; but as to this act, as well as to the act of 1864, there is one objection which we deem conclusive. These statutes were all repealed by section two, chapter 119 of the General Statutes of 1868, and as the defendants' road was not laid out, located or constructed until 1870, until that time they could acquire no right by reason of these grants, when these statutes had ceased to exist and had no operation. Section 2 of chapter 119 is as follows: "All acts of a general nature embodied or reënacted, in whole or in part, in any of the statutes hereinbefore enumerated, or repugnant thereto, are hereby repealed." This law of 1868 was a general law relating to the organization and operation of railroads. The act provided for right-of-way upon state lands, and the manner in which roads could purchase right-of-way and appropriate private lands. Articles 6 and 9 of chapter 23 of the General Statutes of 1868 treated of the same subject, and covered the same general ground as that of chapter 44, under which the defendants claim a continuing grant and right-of-way, and as the statute of 1868 was upon this same general subject, making ample provisions for the appropriation of lands by the exercise of eminent domain by railroad companies, the clause above quoted repeals the entire chapter under which defendants claim.

3. Act repealed before construction of road.

The next claim of the defendants is under chapter 124, Laws of 1871. This was an act in relation to the Missouri, Kansas & Texas Railway Company and the Union Pacific Railway Company, Southern Branch, which act purports to convey and extend to these companies all the rights they then possessed to any part of their line of road to their entire road, and was an attempt in this manner to give the defendants a right-of-way over all lands as fully as that enjoyed over other lands under other acts of the legislature, and was clearly in violation of §1, art. 12, of the constitution, which provides that the legislature shall pass no special act

4. Void statute.

conferring corporate powers.    This was a special act of the
legislature for the benefit of the defendant companies, giving
them special rights and powers, which under the constitution
the legislature was prohibited from doing.

Beyond what we have said so far in relation to this act of
the legislature of the state of Kansas under which the defend-
ants claim title to this land, this much may be said: While
we feel that it is not necessary to decide this question, yet it
is indirectly involved, and, were it not for the fact that the
acts under which the defendants claim right of possession were
repealed by the statute of 1868, would then, we think, be the
controlling question which would determine the defendants'
rights — and that is: Can the state give away the lands ceded
by the government to it for school purposes, to railway com-
panies or others, without compensation therefor?    This land
is held by the state in trust for the schools of the state, and it
is a sacred trust imposed upon the state, and should not be
disregarded.    Section 5 of art. 6 of the constitution of Kansas
is as follows: "The school lands shall not be sold, unless such
sale shall be authorized by a vote of the people at a general elec-
tion; but, subject to revaluation every five years, they may be
leased for any number of years not exceeding twenty-five, at a
rate established by law."    And the constitution, § 3 of art. 6,
in speaking of the proceeds of the sale of school lands, and
other property belonging to the school fund, says: "Shall not
be diminished, but the interest of which, together with all the
rents of the lands, and such other means as the legislature may
provide by tax or otherwise, shall be inviolably appropriated
to the support of common schools."    Now the policy of this
state has been to hold this trust sacred, and not only comply
with the letter but the spirit of the constitution, and to protect
inviolably the school funds; and to adopt the views of the
defendants would be to set aside this construction, and hold
for naught the constitutional provisions and safeguards thrown
around the school property and funds.

In the case of *Cooper v. Roberts*, 18 How. 173, the supreme
court, speaking of the grant of school lands in Michigan,

said: "The grant is to the state directly, without limitation of its power, though there is a sacred obligation imposed on its public faith." If the legislature can transfer a right-of-way over the school lands of the state without compensation, then it can convey the remaining lands belonging to the state, granted for this purpose, for other internal improvements. If it can change one acre, it can change sections; and if it can divert one acre from the legitimate use for which it was given to the state, then it can use all the remaining lands belonging to the school as it may see fit. It is true it may be necessary for railroads to cross school lands, and some provisions must be made and carried into effect by which the right-of-way can be procured, and this is essential to the development of the state; but this can be accomplished as it is accomplished in the case of private property. Land can be condemned by proper proceedings, like the lands belonging to other trusts and to private individuals, and when compensation is made for its value the railroads can have a right-of-way across it; but in this case they are seeking a right-of-way without making compensation, and this right is based upon a violation of the spirit and letter of the constitution.

This closes up the claim of title and right of possession by the defendants, save and except as to the fifteen-years statute of limitation. It is shown and conceded that defendants have been in peaceable possession of this land since June 6, 1870, and they insist that as they have been in possession of the land for more than fifteen years prior to the commencement of this action, the plaintiff is barred. One fact seems to have escaped the notice of the defendants, and that is, that the state owned this land until May 25, 1871, at which time it conveyed by patent to the plaintiff's grantor. That no statute of limitation could run against the state, is a fundamental doctrine. As against the government or the state, no right can attach to land that will defeat the state or its grantees. The defendants were upon this land without right, and could have remained there indefinitely and the state would not have been concluded by such adverse possession; and when the

8 — 43 KAS.

state conveyed to the plaintiff's grantor it conveyed title free from any limitation by adverse possession, and as fifteen years had not elapsed before the bringing of the action and after the issuing of the patent by the state, the defendants cannot claim to hold by adverse possession.

In conclusion, we think that the defendants obtained no right to a way across the land in question by virtue of the act of congress, or by either of the acts of the legislature set up by them; and it is therefore recommended that the judgment of the court below be reversed, and the cause remanded for further proceedings.

By the Court: It is so ordered.

All the Justices concurring.