JAMES M. COOPER, PLAINTIFF IN ERROR, v. ENOCH C. ROBERTS.

18h 173
L-ed 338
20h 480
20h 484
17wa250
95  524
125  637
44f 839
44f 842

It has always been a cherished policy with the government of the United States to appropriate the section numbered sixteen in every township of land for the use of schools.

Reservations were made in the sale of other lands which contained salt springs or lead mines, but not in the appropriation of section sixteen for schools.

When the State of Michigan was admitted into the Union, it was upon the condition that every section numbered sixteen in every township of the public lands, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State for the use of schools.

When the lands are surveyed and marked out, the title of the State attaches to No. 16, and if there be no legal impediment, becomes a legal title.

The act of March 1, 1847, (9 Stats. at Large, 146,) providing for the sale of mineral lands, does not include section sixteen, which remains subject to the compact with Michigan.

Under the operation of that act, and also the act of September, 1850, (9 Stats. at Large, 472,) a lease made in 1845, by the secretary of war, of some mineral lands, (including section sixteen,) did not confer a right upon the mining company, who were the assignees of the lease, to enter their lands and obtain a patent for section sixteen.

It was not necessary for the State of Michigan to obtain the consent of congress before making a sale of the section.

Whether or not the officers of the State of Michigan pursued the laws of the State in effecting the sale, is a question which the occupant of the land cannot raise in this suit.

THIS case was brought up, by writ of error, from the circuit court of the United States for the district of Michigan.

It is stated in the opinion of the court.

It was argued by *Mr. Buel* and *Mr. Vinton*, for the plaintiff in error, and *Mr. Truman Smith*, for the defendant.

Such of the points only as were included within the decision of the court will be noticed.

The counsel for the plaintiff in error first considered the questions which arose relative to the act of 23d June, 1836, granting school lands to Michigan.

1. Is it simply a law in the ordinary meaning of the term, and, as such, repealable at the will of the law-making power, or does it belong to that class of laws which are legislative compacts?

The counsel contended that it was a compact. 5 Stats. at Large, 59, 60.

2. If it be of the latter class, when did it take effect as a compact, and become obligatory on the parties to it?

It became obligatory on 25th July, 1836, that being the day on which the legislature of Michigan passed the act of acceptance. Revised Code of Michigan for 1846, 748; 2 Wheat. 196; 4 Harrington, 479; 9 Wheat. 469.

15 *

3. Does either possess the power to annul or change any of the essential terms of it, without the assent of the other?

Whether the grant of section 16 operated as a present grant, or was only a promise that it should be granted *in futuro*, makes no difference in the obligation of the United States.

4. Viewed as a compact, what are the rules and principles that govern it? And what are the obligations which the article respecting section 16 imposes on the United States?

The rules and principles which govern it are those which regulate contracts generally. 1 Pet. Cond. R. 453; 1 Tenn. 319; 3 Ohio, 572.

That the government cannot resume its grant, and that a grant is a contract executed, see New Orleans *v.* De Armas, 9 Pet. 236. There the court say: "It is a principle applicable to every grant, that it cannot affect preëxisting titles." In Terrett *v.* Taylor, 9 Cranch, 43, (same case, 2 Pet. Cond. R. 321,) held, that where the legislature had the authority to make a grant of lands, such grant, when made, vests an indefeasible and irrevocable title. And in Fletcher *v.* Peck, 6 Cranch, 87, Chief Justice Marshall said: " A grant in its own nature amounts to an extinguishment of the right of the grantor, and implies a contract not to reassert that right; a party, therefore, is always estopped by his own grant." Pollard's Lessee *v.* Hogan, 3 How. 212.

Whether a contract be executed or executory, it is equally binding on the parties to it. Fletcher *v.* Peck, 2 Pet. Cond. R. 321.

5. What is the meaning and effect of that clause in the article which provides, that where section sixteen has been sold or otherwise disposed of, other lands equivalent thereto and as contiguous as may be, shall be granted to the State?

This was to provide for prior and not subsequent sales. Assuming that the act of 1836 was only a promise, and that the act of March 1, 1847, embraced section sixteen, still, Michigan has the better right to it. But that act did not dispose of the mineral lands without reference to the school reservation.

1. Instead of the mineral lands being reserved by the act in pursuance to an established policy, it was a primary object of that act to put an end to the policy that had theretofore prevailed of reserving mineral lands from sale, and to dispose of them by sale as soon as practicable, and for the best price that could be obtained.

2. By the true interpretation of the second section of the act, section sixteen in every township of the district is expressly reserved from sale; and also such reservations as the President shall deem necessary for public uses, whether the same are mineral lands or not.

3. As the interpretation of the court conflicts with prior and existing legislative grants and obligations, those grants and obligations are entitled to the benefit of every legal presumption and inference in their favor; and such effect ought not to be given to the law, unless the intent to produce this conflict be expressed in manifest and undoubted language.

4. If the act had, in general terms, directed the sale of all the lands in the district, but was silent as to the lands previously dedicated and granted to schools, it would not have the effect to divert them from this special use.

Mr. Smith, for the defendants in error, contended :—

1. That the article in the act of 1836 was conceived in words of the future tense; and that the plaintiff below could not make out a title without a patent. 13 Pet. 516 ; 15 How. 433 ; 1 Op. Att. Gen. 273 ; 12 How. 76 ; 14 ibid. 274.

But if we assume that the first article of this compact operated to vest in the State of Michigan the fee, or a good and perfect title to these lands, then the next question is, whether that title has, through Williams, been transferred to the plaintiff? To answer which we must, as already mentioned, turn our attention both to the laws of the United States and of the State of Michigan.

Michigan had no power to sell this section without the assent of congress. The income of each section is to be applied to the support of schools in the township where it is situated, and the State has no power, without the consent of congress, to sell it for the purpose of creating a general fund. 14 How. 274.

This is shown by the numerous acts of congress granting permission to sell. 4 Stats. at Large, 237, 298 ; 5 ibid. 600 ; 10 ibid. 6.

The United States, in granting these lands, are the founders of a charity ; 9 Cranch, 292 ; and their assent is necessary for a sale. 4 Wheat. 518.

But, assuming that the State of Michigan has the entire control of the lands, and can sell them without consulting either the United States or the inhabitants of the townships where situated ; then the question arises, whether these lands were sold in conformity with the laws of the State ?

The argument upon this point is omitted.

Mr. Justice CAMPBELL delivered the opinion of the court.

The plaintiff sued in ejectment, to recover a portion of section No. 16, in township No. 50 north, of range 39 west, lying within the mineral district south of Lake Superior, in Michigan.

His case affirms that this section had been appropriated by the

United States to the State of Michigan for the use of schools, in
their compact, by which that State became a member of the
Union; that the governor of Michigan issued, in November,
1851, to Alfred Williams, a patent, evincing a sale of that sec-
tion under the laws of Michigan, in February, 1851; that he has
a conveyance from the patentee, and that the defendant is a
tenant in possession, withholding the *locus in quo* from him.
The defendant, to support his issue, relies upon a license given
in 1844, by the mineral agent of the United States for that dis-
trict, empowering the donee to examine and dig for lead, and
other ores, for the term of one year, and within that term to
mark out and define a specific tract of land, not to exceed three
miles square, for mining purposes; and, if he should fulfil this
and other conditions, he was to become entitled to a lease for
three years, with a privilege of one or two renewals, under re-
strictions. The secretary of war, in September, 1845, executed
a lease for a tract three miles square, which the donee of the
license had selected, and which included the *locus in quo*, and
stipulated to renew it, if congress shall not have passed a law
"directing the sale, or other disposition, of these lands," and if
the lessee shall have complied with all the conditions of the
present lease, and tendered a bond for the fulfilment of the con-
ditions of the new lease, as described in the act. This lease
came to the Minnesota Mining Company by assignment, and
that company in 1847, and from thence till 1851, held possession
of the land, described in the declaration, erected valuable im-
provements, and made successful explorations for copper upon
it. In November, 1850, the company applied to the proper offi-
cers of the land-office to enter the land comprised in the lease,
and from thence, till the date of their patent in 1852, the right
of the company to secure the *locus in quo* by entry was in dis-
pute in the land-office of the United States. In September, 1851,
the secretary of the interior determined adversely to the claim
of the company, and in favor of the claim of Michigan; and in
1852, upon proofs that the company had complied with the lease,
while he reaffirmed his conclusions in favor of Michigan, allowed
the entry of the company, but with a reservation of the rights of
Michigan. The section No. 16, aforesaid, was surveyed in the
summer of 1847, and the portion in controversy, in the report of
the geological survey of the district, was returned to the land-
office as containing mines of copper. There was no application
to the department of public lands to renew the lease held by the
company, for the reason (it is said) that the system of letting
mineral lands of this kind had been abandoned, upon the doubts
expressed by the attorney-general, in 1846, of the legality of such
leases. Upon the trial of the cause in the circuit court, the

plaintiff moved the court for instructions to the jury, that, upon the facts, he was entitled to a verdict, and that the defendant's patent was invalid.   The court refused the prayer, and told the jury, "that by the act of congress of 1st March, 1847, all the mining lands within the district, reported, were taken out of the operation of the general law for the disposal of the public lands, in pursuance of an established policy to reserve from the ordinary mode of disposing of public lands those that contained valuable salt springs, lead mines, &c., that they might be leased or disposed of to purchasers having full knowledge of their value, by reason of the salt springs or mineral ores they contained, at their full value, for the public benefit.   That, by the above act, all the mineral lands reported by the geologist within the district, in pursuance of this settled policy of the government, were appropriated and disposed of without reference to the school reservation, the appropriation of the land being made before the surveys were executed, and before the locality of section 16 could be known.   And as it appears from the report of the geologist that the land in controversy contains valuable minerals, and was within the boundaries of the lease under which the Minnesota Company claim, and that they had made large expenditures thereon for mining, were entitled to the right of purchase, as provided in the third section of the above law; and having paid for the same, it was a disposition of the land which congress had a right to make, and was an exercise of power within the grant. That the setting apart of another section adjacent will satisfy the grant to the State."

Our first inquiry will be into the nature of the right of the State of Michigan to section No. 16 in the townships of that State, and the effect of the discovery of minerals in such a section upon that right.   The practice of setting apart section No. 16 of every township of public lands, for the maintenance of public schools, is traceable to the ordinance of 1785, being the first enactment for the disposal by sale of the public lands in the western territory.   The appropriation of public lands for that object became a fundamental principle, by the ordinance of 1787, which settled terms of compact between the people and States of the northwestern territory, and the original States, unalterable except by consent.   One of the articles affirmed that "religion, morality, and knowledge, being necessary for good government and the happiness of mankind;" and ordained that "schools, and the means of education, should be forever encouraged."   This principle was extended, first, by congressional enactment, (1 Stats. at Large, 550, § 6,) and afterwards, in 1802, by compact between the United States and Georgia to the southwestern territory.   The earliest development of this

article, in practical legislation, is to be found in the organization of the State of Ohio, and the adjustment of its civil polity, according to the ordinance, preparatory to its admission to the Union. Proposals were made to the inhabitants of the incipient State to become a sovereign community, and to accept certain articles as the conditions of union, which, being accepted, were to become obligatory upon the United States. The first of these articles is, "that the section No. 16 in every township, and where such section has been sold, granted, or disposed of, other lands equivalent thereto and most contiguous to the same, shall be granted to the inhabitants of such township, for the use of schools."

A portion of this territory had been encumbered in the articles of cession by the States, and another portion by congress for the fulfilment of public obligations, prior to the ordinance of 1785, and without reference to the school reservations; therefore, uniformity in the appropriation of the section No. 16 was partially defeated. The southwestern territory was similarly burdened in the compact of cession by Georgia, with the fulfilment of antecedent obligations, and similar paramount obligations have arisen in treaties with the Indian tribes who inhabited it. The rights of private property vested in the inhabitants, ceded with Louisiana and Florida, and guaranteed to them in the treaties of cession, created an obstruction to the same policy within them. But the constancy with which the United States have adhered to the policy in the various compacts with the people of the newly-formed States, and the care which congress has manifested to prevent the accumulation of prior obligations which might interrupt it, fully display their estimate of its value and importance. There is, obviously, a definite purpose declared to consecrate the same central section of every township of every State which might be added to the federal system, to the promotion " of good government and the happiness of mankind," by the spread of " religion, morality, and knowledge," and thus, by a uniformity of local association, to plant in the heart of every community the same sentiments of grateful reverence for the wisdom, forecast, and magnanimous statesmanship of those who framed the institutions for these new States, before the constitution for the old had yet been modelled. Has the discovery of minerals of value upon this section been deemed a sufficient cause for its withdrawal from the operation of this policy, and the compacts which develop it?

The ordinance of 1785 dedicated the section No. 16 for the maintenance of public schools, and in each sale of the public lands there was by the same ordinance a reservation of one-third part of all gold, silver, lead, and copper mines within the town-

ship or lot sold.    No reservations were afterwards made of gold, silver, or copper mines until the acts of March, 1847.    By the act of March 26, 1804, and the act of March, 1807, every "grant of a salt spring or a lead-mine thereafter to be made, which had been discovered previously to the purchase from the United States, was to be considered as null and void."    (2 Stats. at Large, 279, § 6; 449, § 6.)    These statutes indicate a policy to withdraw from sale lands containing these minerals.    But the compacts have been made without such a reservation, nor has the usage of the land-office interpolated such an exception to the general grant of the section No. 16 for the use of schools.

The grant of the section No. 16 for the use of schools can be executed without violating the spirit of the legislation upon salt springs or lead mines, and, as we have seen, no statute prior to the admission of Michigan to the Union contains an appropriation or reservation of other mineral lands.    The State of Michigan was admitted to the Union, with the unalterable condition " that every section No. 16, in every township of the public lands, and where such section has been sold or otherwise disposed of, other lands equivalent thereto, and as contiguous as may be, shall be granted to the State for the use of schools." We agree, that until the survey of the township and the designation of the specific section, the right of the State rests in compact—binding, it is true, the public faith, and dependent for execution upon the political authorities.    Courts of justice have no authority to mark out and define the land which shall be subject to the grant.    But when the political authorities have performed this duty, the compact has an object, upon which it can attach, and if there is no legal impediment the title of the State becomes a legal title.    The *jus ad rem* by the performance of that executive act becomes a *jus in re*, judicial in its nature, and under the cognizance and protection of the judicial authorities, as well as the others.    Gaines *v.* Nicholson, 9 How. 356.

The question now arises whether the act of March 1, 1847, created a legal impediment to the operation of this principle, either by the reservation of the land for public uses, or by its appropriation to superior claims.    In March, 1847, congress established a land district in this region for the disposal of the public lands.    It directed a geological survey for the ascertainment of those containing valuable ores, whether of lead or copper, and a report to the land-office.    It provided for the advertisement and sale of such lands, departing in a measure from that usual mode, as to the length of the notice and the amount of price; and in reference to the remainder of the lands, it applied the usual regulations.    To the section containing these directions, (9 Stats. at Large, 146, § 2,) there is added an

exception from such sales, section No. 16, " for the use of schools, and such reservations as the President shall deem necessary for public uses." It has been argued, that this exception is only applicable to the lands not contained in the geological report, and that the mineral lands "were appropriated and disposed of without reference to the school reservation by this section of the act." But it does no violence to the language to embrace within the exception all the sales, for which the section provides, and we cannot suppose that congress could be tempted, with the hope of a small additional price, which is imposed upon the purchasers of the mineral lands, to raise a question upon its compact with Michigan, or to disturb its ancient and honored policy. We think the interpretation which claims this as an exception in favor of Michigan, is to be preferred to that which excludes her from the mineral lands under this compact. And this conclusion is strengthened by the fact that the power of the President to make useful public reservations is connected in the exception with the school reservations. There could be no reason for limiting the power of the President to a single class of the public lands, and to exclude him from another in the same district. We conclude that this act does not withdraw the mineral lands from the compact with Michigan.

Did the execution of the lease by the secretary of war, in 1845, before the survey of the lands, dispose of these lands so as to defeat the claim of the State? The Minnesota Mining Company, at the date of the act of March 1, 1847, held the unexpired lease by assignment, and continued to perform its conditions until their patent was issued. The 3d section of that act authorized the persons in possession under such a lease, who had fulfilled its conditions, to enter in one tract all the lands included in it, at a diminished price, " during the continuance of the lease." The 4th section directed the sale of the mineral lands contained in the report, but with a proviso, that none of the lands contained in any outstanding lease, whose conditions had been fulfilled, should be sold till the expiration of the lease, either " by efflux of time, voluntary surrender, or other legal extinguishment." The act of congress of September, 1850, (9 Stats. at Large, 472,) abrogated such of the clauses of the act of 1847, which distinguished the mineral from other public lands, and placed them alike, under the ordinary system for the disposal of the public domain, but reserved to lessees and occupants the privileges conferred by the act of 1847. From that time, therefore, the argument " that the mining lands within the district were taken out of the general law for the disposal of the public lands, by the act of March, 1847," lost all its cogency, and the rights of the Minnesota Company depended entirely

upon the validity of the lease and the protection accorded to the lessee. The lease expired by "efflux of time," in September, 1848. There was no renewal of the lease, for the double reason, that its original validity was doubted by the highest executive authority, and those doubts were submitted to by the lessee, and because congress had passed the law for the disposal of the mineral lands, which determined the covenant for renewal, by the terms of the lease itself.

Hence, had there been a legal impediment to the execution of the compact with Michigan, erected either by the second section of the act of 1847, which separated for some purposes the mineral from other public lands, or by the privileges granted to lessees or their assigns, in the 3d section of that act, it was removed by the repealing clause of the act of 1850, and the noncompliance with the conditions on which the privileges depended. The section No. 16 was, at that date, disencumbered, and subject to the operation of the compact, whatever might have been its preëxisting state.

That compact had not been fulfilled by an assignment to the State " of equivalent lands, contiguous as may be," under the act of May 20, 1826. (4 Stats. at Large, 179.) Shortly after the passage of the act of 1850, we find Michigan asserting her claim to this section, advertising it for sale, and selling it to the vendor of the plaintiff. We also find the officers of the land-office of the United States denying the right of the Minnesota Mining Company to enter the land, and admitting the superior title of the State of Michigan, and finally reserving those rights in the patent issued to the company. We entirely concur with these officers in their decision on the subject of contest, for the reasons we have given. We think that the jury should have been instructed, that the section No. 16 was vested in the State of Michigan at the date of the entry by the Minnesota Mining Company, and that the company did not acquire title by its patent.

The defendant insists that the title of the plaintiff is invalid, for the reason that the State of Michigan was not empowered by congress to sell the school reservations. Where such grants have been made to the State, or to the inhabitants of the township for the use of schools, it has been usual for congress to authorize the sale of the lands, if the State should desire it. (4 Stats. at Large, 138, 237, 298 ; 5 Ib. 600.) But this consent was not, perhaps, necessary, and the application for it is but evidence of the strong desire of the state authorities to act in good faith, and to keep within the pale of the law. 4 Ala. R. 622.

The trusts created by these compacts relate to a subject cer-

tainly of universal interest, but of municipal concern, over which the power of the State is plenary and exclusive. In the present instance, the grant is to the State directly, without limitation of its power, though there is a sacred obligation imposed on its public faith. We think it was competent to Michigan to sell the school reservations without the consent of congress.

The defendant further objects, that the officers of the State violated the statutes of Michigan in selling these lands, after they were known, or might have been known, to contain minerals. Without a nice inquiry into these statutes, to ascertain whether they reserve such lands from sale, or into the disputed fact whether they were known, or might have been known, to contain minerals, we are of the opinion that the defendant is not in a condition to raise the question on this issue. The officers of the State of Michigan, embracing the chief magistrate of the State, and who have the charge and superintendence of this property, certify this sale to have been made pursuant to law, and have clothed the purchaser with the most solemn evidence of title. The defendant does not claim in privity with Michigan, but holds an adverse right, and is a trespasser upon the land, to which her title is attached.

Michigan has not complained of the sale, and retains, so far as the case shows, the price paid for it. Under these circumstances, we must regard the patent as conclusive of the fact of a valid and regular sale on this issue.

Upon the whole record, we think the jury should have been instructed, that if they found the facts thus given in evidence to be true, the plaintiff was entitled to recover the premises in question. Judgment reversed; cause remanded—a *venire* to issue.