UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DISTRICT 22 UNITED MINE
WORKERS OF AMERICA;
MICHAEL SVETICH; MAURICE
BROWN; CHARLES BYRGE; and
J.R. SCOTT,

      Plaintiffs-Appellants and Cross-
      Appellees,

v.

STATE OF UTAH; THE SCHOOL
AND INSTITUTIONAL TRUST
LANDS ADMINISTRATION,

      Defendants-Appellees and
      Cross-Appellants,

_____

UTAH STATE BOARD OF
EDUCATION and STATE OFFICE
OF EDUCATION,

      Amicus Curiae.

Nos. 98-4092, 98-4100

---

ORDER
Filed November 6, 2000

---

Before **TACHA**, **BRORBY** and **EBEL**, Circuit Judges.

---

This matter is before the court on appellees' petition for rehearing. We also have appellants' motion for permission to respond to the petition for rehearing. We grant the motion for permission to respond and direct the clerk of this court to file appellants' response.

The petition for rehearing is denied. Although the request for rehearing is denied, the panel has determined that the original decision, filed on October 12, 2000, shall be amended. Specifically, footnote three is revised as follows:

> We agree with the district court that United States v. New Mexico, 536 F.2d 1324 (10th Cir. 1976) is not dispositive of the present case because the New Mexico-Arizona Enabling Act contained trust language and provides for the specific disposition of the lands granted.

The original opinion is withdrawn and a copy of the panel's amended opinion is attached to this order.

Entered for the Court

Patrick Fisher, Clerk of Court

By:
    Keith Nelson
    Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**OCT 12 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DISTRICT 22 UNITED MINE
WORKERS OF AMERICA;
MICHAEL SVETICH; MAURICE
BROWN; CHARLES BYRGE; and
J.R. SCOTT,

      Plaintiffs-Appellants and Cross-
      Appellees,

v.

STATE OF UTAH; THE SCHOOL
AND INSTITUTIONAL TRUST
LANDS ADMINISTRATION,

      Defendants-Appellees and
      Cross-Appellants,

_____

UTAH STATE BOARD OF
EDUCATION and STATE OFFICE
OF EDUCATION,

      Amicus Curiae.

Nos. 98-4092, 98-4100

---

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 96-CV-695-K)**

---

Kerry L. Chlarson, Sandy, Utah (Robert B. Sykes, James D. Vilos, and Jarett K.
Abramson, of Sykes & Vilos, P.C., Salt Lake City, Utah, with him on the briefs),
for Plaintiffs-Appellants.

Debra J. Moore, Assistant Utah Attorney General, Salt Lake City, Utah, for Defendant-Appellee.

Gayle F. McKeachnie of McKeachnie, Allred & McClellan, P.C., Vernal, Utah, filed a brief on behalf of the Amicus Curiae.

---

Before **TACHA**, **BRORBY** and **EBEL**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

The United Mine Workers of America, District No. 22, Michael Svetich, Maurice Brown, Charles Byrge, and J.R. Scott (collectively, the "Miners") filed a complaint against the State of Utah and the School and Institutional Trust Lands Administration (together, "Utah") in the United States District Court for the District of Utah alleging breach of trust with respect to certain lands within the state of Utah conveyed by the federal government to Utah for a miners' hospital. In general terms, the Miners alleged that 100,000 acres of land and proceeds therefrom are held in trust by Utah for the purpose of establishing a hospital for the benefit of disabled miners, and that Utah has breached that trust by using the trust corpus and revenue for the benefit of the general public rather than disabled miners.

Utah moved to dismiss on various grounds, and the Miners moved for partial summary judgment. In <u>United Mine Workers of America, Dist. No. 22 v.</u>

State of Utah, 6 F. Supp. 2d 1298 (D. Utah 1998) ("Mine Workers"), the district granted Utah's motion to dismiss and denied the Miners' motion for partial summary judgment.  The Miners appeal the judgment of the district court.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we AFFIRM in part, REVERSE in part, and REMAND for further proceedings.

## BACKGROUND

The road to statehood for Utah was a long one.  Beginning in 1849, the Utah territory sought statehood on numerous occasions before making a final successful appeal to Congress in 1893-94.  See John J. Flynn, Federalism and Viable State Government–The History of Utah's Constitution, 10 Utah L. Rev. 311, 314-22 (1966); Stanley S. Ivins, A Constitution for Utah, 15 Utah Hist. Q. 95, 95-100 (1957).  The bill that was to become the enabling act for the state of Utah (the "Utah Enabling Act") was introduced in the fall of 1893 and, after passing the House and Senate, was signed into law by President Grover Cleveland on July 16, 1894.  See Flynn, supra, at 322-23; Ivins, supra, at 100; [see also Act

---

[1]Utah filed a cross-appeal in this case.  Utah's brief, however, states that Utah intends "to file a motion to voluntarily dismiss its cross-appeal."  To date, this motion has not been filed.  Because no briefs have been filed in connection with this cross-appeal, we dismiss the cross-appeal.

of July 16, 1894, ch. 138, 28 Stat. 107 *reprinted in* 1A Utah Code Ann. 43-52 (1953) [hereinafter "Utah Enabling Act"].

The Utah Enabling Act authorized the electorate of the territory of Utah to organize a constitutional convention. <u>See</u> Utah Enabling Act, § 2. Delegates were elected to the convention in November 1894. <u>See</u> Ivins, <u>supra</u>, at 100. The convention convened in March 1895, completing its work in May of that year. <u>See</u> <u>id.</u> at 100, 115. The territory's voters ratified the constitution in November 1895 by a vote of 31,305 to 7,687. <u>See</u> <u>id.</u> at 115. On January 4, 1896, President Grover Cleveland officially proclaimed Utah's statehood. <u>See</u> <u>id.</u> at 116; Act of January 4, 1896, ch. 9, 29 Stat. 876; <u>see</u> <u>also</u> Utah Enabling Act, § 4 (providing that proclamation by the President would result in Utah being deemed admitted into the Union by Congress).

Congress made numerous grants of federal land to the state in the Utah Enabling Act. These grants varied in size and were intended to be used for a variety of purposes. This appeal requires us to determine the character of a grant of 50,000 acres (later expanded to 100,000 acres) for a "miners' hospital for disabled miners," which is set forth in § 12 of the Utah Enabling Act. Section 12 provides in relevant part:

> . . . the following grants of land are hereby made to said State
> for the purposes indicated, namely:

. . . for a miners' hospital for disabled miners, fifty thousand acres . . . .

The said State of Utah shall not be entitled to any further or other grants of land for any purpose than as expressly provided in this Act; and the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislature of the State may provide.

Utah Enabling Act, § 12.[2]

The Utah Constitution addressed the Congressional land grants in Article XX, Section 1, which, at the time Utah acquired statehood, provided:

All lands of the State that have been, or may hereafter be granted to the State by Congress, and all lands acquired by gift, grant or devise, from any person or corporation, or that may otherwise be acquired, are hereby accepted, and declared to be the public lands of the State; and shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purposes for which they have been or may be granted, donated, devised, or otherwise acquired.

Utah Const. art. XX, § 1. This section of the Utah Constitution was subsequently amended in 1998.

The state of Utah sought an additional grant of federal lands for the benefit of miners from Congress in 1929, apparently because the original 50,000 acre grant was insufficient in size to fund adequately a miner's hospital. See 53 Cong.

---

[2]Section 12 of the Utah Enabling Act also provides for a 500,000 land grant for water reservoirs and land grants of 100,000 acres each for an insane asylum, a school of mines, a deaf and dumb asylum, a reform school, normal schools, and an institution for the blind. See National Parks and Conservation Ass'n v. Board of State Lands, 869 P.2d 909, 920 n.8 (Utah 1993).

Rec. H1794-95 (daily ed. Jan. 16, 1929) (statements of Rep. Colton); 53 Cong. Rec. H3600 (daily ed. Feb. 1, 1929) (same). In response to this request, on February 29, 1929, Congress granted the State of Utah an additional 50,000 acres:

> That in addition to the provisions made by the Act of Congress approved July 16, 1894 (Twenty-eighth Statutes at Large, page 110), for a miners' hospital for disabled miners, there is hereby granted to the State of Utah, subject to all the conditions and limitations of the original grant, an additional fifty thousand acres for a miners' hospital for disabled miners to be selected by the State, under the direction and subject to the approval of the Secretary of the Interior, from vacant nonmineral surveyed unreserved public lands of the United States in the State of Utah and not to include lands that are likely to be needed hereafter for inclusion in Federal reclamation or national park projects.

Act of February 20, 1929, ch. 280, § 1, 45 Stat. 1252 [hereinafter the "1929 Act"].

The Miners assert that the 100,000 acres of land granted to Utah by Congress in the Utah Enabling Act and the 1929 Act (the "Lands") are held in trust by the state of Utah for a miner's hospital for disabled miners and that Utah breached the trust by using the trust corpus and trust revenue for a rehabilitation center for the general public instead of using the corpus and revenues for a miners' hospital for disabled miners. The Miners filed the present action in federal district court, seeking: (1) a declaratory judgment that Utah had breached its trust obligations; (2) an accounting of the monies that should have been placed

in the trust over time; and (3) injunctive relief in the form of an order requiring Utah to fund a hospital for the benefit of disabled miners.

As relevant to this appeal, Utah filed a motion to dismiss on various grounds, including the theory that the Miners' claims are barred by the statute of limitations. The Miners opposed the motion to dismiss and also sought partial summary judgment to the effect that Lands were held in trust by the state of Utah for the purpose of establishing a miners' hospital. The Miners asserted two separate theories for the creation of the trust. The Miners first urged that Congress created a trust through the Enabling Act and that the state of Utah accepted the trust obligations in the Utah Constitution. In the alternative, the Miners argued that a trust requiring that the Lands be used to establish a miners' hospital was created by the Utah Constitution. The district court granted Utah's motion to dismiss and denied the Miners' motion for partial summary judgment after concluding that the Lands are not held in trust under either theory. We hold that the district court correctly concluded that the Utah Enabling Act did not create a trust but erred in concluding that a trust was not created for the establishment of a miners' hospital by the Utah Constitution.

**DISCUSSION**

## I.  Mootness

Utah argues that this court should dismiss this appeal because their breach of trust claim is moot.  Utah urges that Congress rendered the Miners' breach of trust claim moot when it adopted legislation that ratified Utah's proposed use of the proceeds derived from the Lands for a rehabilitation building rather than for a miners' hospital.  Utah points out that, since 1959, all "funds, assets and revenues which have been, or will be, derived from the sale or other disposition of those lands conveyed to the State of Utah by those certain federal grants for a Miners' Hospital for Disabled Miners contained in section 12 of the enabling act and in Chapter 280, Public Laws of the Seventieth Congress, 2d Session (Act of February 20, 1929)" have been appropriated to the University of Utah for the construction and operation of a "rehabilitation building."  Utah Code Ann. §§ 53-31-42 to -45 (1960), recodified at Utah Code Ann. §§ 53B-17-201 to -202 (1997 & Supp. 1999).  Utah alleges that its decision to dispose of the proceeds in this manner was ratified by Congress in 1996, based on the following language in the Omnibus Consolidated Appropriations Act (the "Appropriations Act"):

> The Congress of the United States hereby designates and ratifies the assignment to the University of Utah as successor to, and beneficiary of, all the existing assets, revenues, funds and rights granted to the State of Utah under the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and the School of Mines Grant (July 26, 1894, 28 Stat. 110).  Further, the Secretary of the Interior is authorized and directed

to accept such relinquishment of all remaining and unconveyed entitlement for quantity grants owed the State of Utah for the Miners Hospital Grant (February 20, 1929, 45 Stat. 1252) and any unconveyed entitlement that may remain for the University of Utah School of Mines Grant (July 26, 1894, 28 Stat. 110).

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 116, 110 Stat. 3009, 4529-30 (1996). Although the Appropriations Act initially did not include the original Enabling Act grant of 50,000 acres for a miners' hospital, in 1997 Congress amended the Appropriations Act to include that original 50,000 acre land grant as well. See Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105-83, § 119, 111 Stat. 1543, 1564 (1997).

"We review the issue of mootness de novo. Generally, a federal court cannot give opinions absent a live case or controversy before it. Specifically, a case becomes moot when it becomes impossible for the court to grant any effectual relief whatever to a prevailing party." Boullion Aircraft Holding Co. v. Smith Management (In re Western Pac. Airlines), 181 F.3d 1191, 1994 (10th Cir. 1999) (internal citations and quotations omitted). A case may become moot because events subsequent to the filing of the case have resolved the dispute and, as a result, there is no longer an actual controversy between adverse litigants. See Erwin Chemerinsky, Federal Jurisdiction § 2.5.1 (3d ed. 1999).

While the amendment by Congress of earlier legislation is one event that may moot a case or controversy, see United States Dep't of Treas., Bur. of Alcohol, Tobacco, & Firearms v. Galioto, 477 U.S. 556, 559-60, 106 S. Ct. 2683, 91 L. Ed. 2d 459 (1986), we do not find that the federal legislation to which Utah refers renders the present case moot. This is because we find a trust here under the Utah Constitution, rather than under the Utah Enabling Act and 1929 Act. Whatever ability Congress may have to change rights flowing from its earlier legislation (an issue that we do not address because of our conclusion that the Enabling Act and the 1929 Act did not create a trust or give the Miners any trust rights thereunder), Congress cannot, by amending its initial grant legislation, eliminate trust rights that Utah established in its Constitution after it received these lands from the federal grants.

Utah argues that the Appropriations Act takes precedence over any state-created trust pursuant to the Supremacy Clause. U.S. Const., art. VI, cl.2. However, all of the cases cited by Utah in support of this argument deal with the question of federal preemption of state law claims. The United States undoubtedly has the authority under certain circumstances to preempt state statutory and common law. But Utah presents no authority for the proposition that Congress can, without compensation, preempt a state law breach of trust claim which asserts long-since vested private rights and is brought by the

- 10 -

beneficiaries of a trust, where the trust was created in the Utah Constitution and for which the state is trustee over state-owned lands.  Even if Congress has such authority, it is not clear that Congress intended the Appropriations right to pre-empt Utah's ability to set up this trust under its Constitution for the miners to hold the land that it received from the federal government.  Utah relies on the decision of the Washington Supreme Court in <u>Makah Indian Tribe v. Washington</u>, 457 P.2d 590 (Wash. 1969).  That case, however, only stands for the proposition that a state may, through legislative action, decline to apply a state constitutional provision disclaiming state jurisdiction over Indians.  <u>See</u> <u>id.</u> at 593-94.  We do not find that case apposite to the claim before us.

## II.    Whether the Lands are Held in Trust

### A.    Creation of Federal Trust Under the Enabling Act

In <u>Branson Sch. Dist. RE-82 v. Romer</u>, 161 F.3d 619 (10th Cir. 1998), this court addressed the issue of whether certain lands granted to the state of Colorado under Colorado's enabling act were held in trust.  Although <u>Branson</u> involves a different enabling act and the lands there were granted for the benefit of public schools, <u>Branson</u> nonetheless guides our analysis of whether the Land Grants here are held in trust by Utah.

"[T]he question of whether a statehood statute creates a federal trust requires a case-specific analysis of the particular state's enabling statute because the history of each state's admission to the Union is unique." Id. at 633. This is because Congress' treatment of land grants evolved over time. See id.; Papasan v. Allain, 478 U.S. 265, 289-90 n. 18, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986).

The Supreme Court initially treated the land grants made to Alabama (in 1819) and Michigan (in 1847) as honorary obligations in the nature of "solemn agreements," rather than trusts. See Branson, 161 F.3d at 633 (citing Papasan, 478 U.S. at 289-90 n.18; Alabama v. Schmidt, 232 U.S. 168, 173-74, 34 S.Ct. 301, 58 L. Ed. 555 (1914); Cooper v. Roberts, 59 U.S. (18 How.) 173, 181-82, 15 L. Ed. 338 (1855)). These particular land grants, however, are notable for the sparse language providing for the grants. See id. In the case of Alabama, Congress simply conveyed each Section 16 of every township in the new state "to the inhabitants of such township for the use of schools." See Alabama v. Schmidt, 232 U.S. 168, 172, 34 S. Ct. 301, 58 L. Ed. 555 (1914). For Michigan, Congress conveyed each Section 16 in every township "to the State for the use of schools." See Cooper v. Roberts, 59 U.S. (18 How.) 173, 179, 15 L. Ed. 338 (1855).

At the other end of the spectrum are the land grants to New Mexico (in 1898 and 1910) and Arizona (in 1910). These land grants were more specific in

nature, see Branson, 161 F.3d at 633, and the Supreme Court in those cases held

that the school lands were granted to the states to be held in trust. See Lassen v.

Arizona ex rel. Ariz. Highway Dep't, 385 U.S. 458, 460-61, 87 S. Ct. 584, 17 L.

Ed. 2d 515 (1967); Ervien v. United States, 251 U.S. 41, 48, 40 S. Ct. 75, 64 L.

Ed. 2d 128 (1919).

Branson explained that Colorado was admitted to the Union in 1875 and

that its enabling act fell somewhere in between the Michigan/Alabama and New

Mexico/Arizona experiences, both in terms of chronology and specificity. See

Branson, 161 F.3d at 633. The Utah Enabling Act of 1894 is identical to

Colorado's in this respect. The New Mexico-Arizona Enabling Act apparently

contained the first express declaration by Congress that all lands granted to the

states were to be held in "trust." See Wade R. Budge, Comment, Changing the

Focus: Managing State Trust Lands in the Twenty-First Century, 19 J. Land

Resources & Envtl. L. 223 (1999). Unlike the New Mexico-Arizona Enabling

Act, the Utah and Colorado enabling acts do not state that the lands are to be held

in trust.[3] Because this court determined in Branson that the Colorado Enabling

---

[3] We agree with the district court that United States v. New Mexico, 536 F.2d 1324 (10th Cir. 1976) is not dispositive of the present case because the New Mexico-Arizona Enabling Act contained trust language and provides for the specific disposition of the lands granted.

- 13 -

Act gave the lands in trust to the state, the analysis in Branson is particularly relevant to the present case.

"A trust is created when a settlor conveys property to a trustee with a manifest intent to impose a fiduciary duty on that person requiring that the property be used for a specific benefit of others." Branson, 161 F.3d at 633. Congress may create a trust through "the manifestation of an intent to create a fiduciary relationship." Id.; see also Flint, supra, at § 7; Perry, supra, at §30. A settlor is not required to use any particular form of words in expressing its intent to create a trust, and the absence of trust language does not preclude the formation of a trust. See Branson, 161 F.3d at 634; James H. Flint, Trusts and Trustees § 34 (1890); Jairus W. Perry, Trusts and Trustees § 82 (1899). "Instead, the creation of a trust depends on whether the relevant statutory provision contains 'an enumeration of duties' which would justify a conclusion that Congress intended to create a trust relationship." Branson, 161 F.3d at 634.

We then went on to apply these principles to the Colorado Enabling Act, concluding that it contained a sufficient enumeration of duties to indicate Congress's intent to create a fiduciary relationship between the state of Colorado and its common schools. See Branson, 161 F.3d at 634-35. Initially, we found that the language in the Colorado Enabling Act that the school lands "are hereby granted to the said State for the support of the common schools." Colorado

- 14 -

Enabling Act § 7, 18 Stat. at 475, was insufficient to create a trust. We reasoned that this language, standing alone, would not be sufficient to establish a federal trust because it is no more specific than the language of the Michigan and Alabama grants, which were found to create only "honorary" obligations to support the states' common schools. See Branson, 161 F.3d at 634.

We then noted, however, that the language of section 7 was supplemented by other language in section 14 of the Colorado Enabling Act. "In that clause, for the first time in any of Congress' school-lands legislation, Congress created explicit restrictions on how the school lands could be managed or disposed." Id. at 634. Congress required the following of Colorado:

> That the two sections of land in each township herein granted for the support of common schools shall be disposed of only at public sale and at a price not less than two dollars and fifty cents per acre, the proceeds to constitute a permanent school-fund, the interest of which to be expended in the support of common schools.

Colorado Enabling Act § 14, 18 Stat. at 476. We found that these restrictions evidenced Congress' intent to create a trust because they enumerated Colorado's specific duties and were explicitly imposed to serve Congress' ultimate goal of providing "permanence" and a sound financial basis for the "support" of the state's common schools in perpetuity. See Branson, 161 F.3d at 634. Based in large part on the enumeration restrictions, we concluded that Congress intended to

- 15 -

create a fiduciary obligation for the state of Colorado to manage the school lands in trust for the benefit of the state's common schools. See id., 161 F.3d at 634-35.

Like the Colorado Enabling Act, the Utah Enabling Act simply provides that the fifty thousand acres was granted: "for the purpose[] indicated, namely: . . . [F]or a miner's hospital for disabled miners . . . ." As noted in Branson, this language alone is not sufficient to create a trust.

However, unlike the Colorado Enabling Act, the Utah Enabling Act does not go on to place any "explicit restrictions on how the . . . lands could be managed or disposed" by limiting the manner in which the state may sell the lands. See Sally K. Fairfax, et. al., The School Trust Lands: A Fresh Look at Conventional Wisdom, 22 Envtl. L. 797, 821 (1992) (noting that Utah is the only state that entered the Union after Colorado that was not subject to specific limits on its authority to sell the school allotments contained in its enabling act).

The Utah Enabling Act provides that: "the lands granted by this section shall be held, appropriated, and disposed of exclusively for the purposes herein mentioned, in such manner as the legislature may provide." The Utah Enabling Act, however, then expressly gives the Utah legislature discretion to dispose of the lands "in such manner as the legislature may provide." We agree with the district court that this express latitude given to the State of Utah militates against the creation of a trust. See Mine Workers, 6 F. Supp.2d at 1302-03.

- 16 -

Although it is a close case, we believe these distinctions between the Utah Enabling Act and the Colorado Enabling Act are sufficient to lead to a different result here. Thus, we agree with the district court and conclude that the Utah Enabling Act does not create a trust because it does not sufficiently direct and restrict the legislature as to the manner in which it may dispose of the Lands and proceeds therefrom.

### B. Creation of State Trust Under the Utah Constitution

The Miners argue in the alternative that a trust was created in the Utah Constitution, and we agree.

The Constitution of the State of Utah states explicitly that the Lands are held in trust and establishes strict limitations on the use that may be made of them:

> "[The Lands] shall be held in trust for the people, to be disposed of as may be provided by law, for the respective purpose for which they have been or may be granted . . ."

Utah Const., art. XX, § 1.

The Utah Supreme Court has emphasized in a number of cases that the state of Utah accepted the lands granted to it by Congress under the Utah Enabling Act and agreed to hold those lands in trust pursuant to the Utah Constitution. See Consolidation Coal Co. v. Utah Div. of State Lands & Forestry, 886 P.2d 514,

525 (Utah 1994); National Parks & Conservation Ass'n v. Board of State Lands, 869 P.2d 909, 917-20 & n. 7 (Utah 1993); Plateau Mining Co. v. Utah Div. of State Lands & Forestry, 802 P.2d 720, 729 (Utah 1990); Duchesne County v. State Tax Comm'n, 140 P.2d 335, 338 (Utah 1943).

Given the explicit trust language in the Utah Constitution and Utah's construction of its Constitution as imposing a trust on land received under the Utah Enabling Act, we conclude that these Lands are held in trust pursuant to the Utah Constitution.

## III. Statute of Limitations and Other Defenses

Utah argues that even if this court finds that the Lands are held in trust by the State of Utah, we should nonetheless affirm the judgment against the Miners' on the alternative ground that their breach of trust claim is barred by the statute of limitations. Utah raised this argument in the district court, but the district court did not reach the issue. "We are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." United States v. Sandoval, 29 F.3d 537, 542 n.6 (10th Cir. 1994) (citation and quotations omitted). However, here we decline to affirm the judgment of the district court on this alternate ground due to the factual nature of the statute of limitations inquiry in this case.

- 18 -

Breach of trust actions brought under Utah state law are subject to the four-year period of limitations set forth in Utah Code § 78-12-25(3). See Snow v. Rudd, 998 P.2d 262, 265 (Utah 2000). However, "a statute of limitations period will not begin to run until the beneficiary knows or through reasonable investigation could have learned of a breach or repudiation." Snow, 998 P.2d at 266; see also Walker v. Walker, 404 P.2d 253, 257 (Utah 1965) (explaining that a statute of limitations defense "is not available to a trustee as against his beneficiaries until something has occurred to give a clear indication to them that he has repudiated his trust; or the circumstances are such that they may be charged with knowledge of such repudiation"); Thomas v. Glendinning, 44 P. 652, 654 ("[W]hen the trustee denies the trust, and assumes ownership of the trust property, or denies his liability or obligation under the trust relation, in such a manner that the cestui que trust has actual, or even constructive, notice of the repudiation of the trust, then the statute of limitations attaches, and begins to run from that time . . . ."); Wood v. Fox, 32 P. 48, 52 (Utah 1893) ("The law is that the statute of limitations begins to run against a claim growing out of a trust from the time the trustee repudiates the trust and the cestui que trust has notice."). "Whether a given act is consistent with the continuance of the trust, or indicates an intent to repudiate the trust and claim adversely, is a question of fact for the

determination of the court in each individual case." George G. Bogert & George T. Bogert, <u>The Law of Trusts and Trustees</u> § 951 (2d ed. 1995).

Utah urges that the Miners' breach of trust claim accrued more than 35 years before the Miners filed their complaint in 1996 by virtue of the legislation passed by the Utah legislature in 1960 conveying all proceeds from the Lands to the University of Utah for the construction of a rehabilitation building. <u>See</u> Utah Code Ann. §§ 53B-17-201 to -202 (1997 & Supp. 1999) (formerly codified at Utah Code Ann. §§ 53-31-42 to -45 (1960)). Utah argues that Utah Code § 53-31-44 (1960) (repealed 1983) is evidence that the Miners had actual knowledge of the breach in 1960. Section 53-31-44 provided that upon construction of the rehabilitation building, the unit would be "staffed and operated in accordance with the rules and regulations of the board of regents of the University of Utah, assisted by an advisory council." The advisory council consisted of one member from each of the following organizations:

> International Union of Mine, Mill and Smelter workers, United Mine Workers of America, Union Steel Workers AFL-CIO, Utah Mining Association, state department of vocational rehabilitation, state industrial commission, state department.

Utah Code § 31-44 (1960) (repealed 1983). Assuming this action constituted a breach of the trust, Utah reasons that actual knowledge of the breach can be attributed to the Miners in 1960 due to the United Mine Workers' presence on the advisory council. Utah argues in the alternative that the Miners had constructive

knowledge of the breach by virtue of the enactment of the legislation providing for a rehabilitation hospital.

There are unresolved factual and legal questions concerning whether Utah's actions constituted a breach of its trust obligations to the Miners under the Utah Constitution and, if so, when the Miners knew or should have known of the breach. Because the district court did not reach these issues, but decided the case before us on a § 12(b)(6) motion based on a ruling that there was no trust, we conclude that the record is inadequate for us to resolve these issues in the first instance. See Zeidler v. United States, 601 F.2d 527, 531-32 (10th Cir. 1979) (remanding for determination of when statute of limitations accrued based on determination that the record as established by the pleadings was insufficient to establish necessary factual background).

Similarly, Utah raises a number of other defenses and arguments as to why it should not be liable even if a trust benefitting the Miners did exist on the Lands. We conclude, as we did with the statute of limitations defense, that these issues are best considered in the first instance by the district court upon remand.

**CONCLUSION**

We AFFIRM the dismissal of the Miners' claim that a trust was created pursuant to the Utah Enabling Act. However, we REVERSE the district court's

dismissal of the claim that a trust was created pursuant to the Utah Constitution because we conclude that a trust was created by the Utah Constitution in favor of the Miners with regard to the Lands in question. We REMAND the case for further proceedings on all remaining issues.