LUCERO, Circuit Judge,
dissenting, joined by
HOLLOWAY, Circuit Judge.
This is a pivotal case which, unless reversed or modified, will have long-term deleterious effects on the use and management of federal public lands. It also expands the doctrine of prudential standing by arrogating to appellate courts unbounded and unprecedented authority to reverse trial court decisions without addressing the merits. Rather than following the clear precedent of the Supreme Court, this circuit, and other circuits, the majority instead utilizes extreme means to nullify the trial court’s injunction prohibiting Kane County from substituting its own policies for a duly enacted federal management plan on federal public lands. Because it seems to me patently inappropriate to misstate and misconstrue the positions of the parties and the rulings of the trial court to achieve this result, I respectfully but emphatically dissent.
Despite the claims of the parties, we are told that this case is not about preemption but about property. The Quiet Title Act (“QTA”) is turned on its head and it is declared that only the dominant holder of property — the United States — may vindicate its regulations against a claimed R.S. 2477 right-of-way. A citizen’s right to protest and be heard on the supremacy of federal rules and regulations is ignored, and notwithstanding the resulting chaos in the management of federal public lands, the majority declares: prudence dictates that the federal courts should remain silently in their chambers.
Perhaps some or all of the R.S. 2477 rights-of-way claimed by Kane County are valid. But the validity of these claimed rights-of-way is not properly before us. The United States’ title was not — and could not be — determined in this litigation because Kane County chose not to bring a claim against the United States under the QTA, “the exclusive means by which adverse claimants [may] challenge the United States’ title to real property.” Block v. *1181 North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983) (footnote omitted).
Kane County’s primary claim of error is that the trial court acted improperly when, as mandated by Block, it required the County to assert a QTA claim against the United States in order to advance the affirmative defense of R.S. 2477 rights-of-way ownership. Yet the majority decision on prudential standing trumps consideration of that question and all other issues properly brought to us by the parties. On the basis of claimed prudence, the en banc court elevates any claim to R.S. 2477 rights-of-way — irrespective of validity or scope, no matter how fanciful or inventive — to a status superior to validly promulgated federal rules and regulations that manage public lands. Tomorrow, Kane County can proceed with its signage program.
But only by erroneously asserting that property rights were at stake in this case can the majority contend that the plaintiffs lack prudential standing. As a consequence of this erroneous analysis, the majority has concluded that the United States’ title to real property can be destroyed outside of a QTA claim, violating Block and creating a circuit split with the Seventh and District of Columbia Circuits, which have each properly prohibited claimants from asserting R.S. 2477 rights over federal land outside of a QTA action. See Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 228-29 (D.C.Cir.2009); Shawnee Trail Conservancy v. U.S. Dep’t of Agric., 222 F.3d 383, 386-88 (7th Cir. 2000).
By definition, off-road vehicles and all-terrain four wheelers are designed to be driven off roads and across all terrains. When coupled with the inescapable truth that in the past R.S. 2477 rights have been falsely claimed over dry creek beds, horse and hiking trails, and jagged rock outcroppings, the resulting anarchy and chaos in the national parks, national monuments, and federal public lands lying within this circuit is profound.
I
Before addressing the merits of the majority opinion, I clarify some initial facts. A full version of the factual narrative leading up to this case is available in the original panel decision, see Wilderness Society v. Kane County, 581 F.3d 1198, 1205-09 (10th Cir.2009), but some general points are worth noting. As does the panel dissent, the majority mischaracterizes the history of this dispute as an oasis of peace in which Kane County cordially sought to assert its R.S. 2477 rights. Contrary to this idyllic narrative, the County unilaterally acted upon its own interpretation of the law, and it was only after Kane County officials took aggressive action that the plaintiffs filed suit.
The majority begins its opinion by asserting that the events relevant to this case started when Kane County “requested” that the Bureau of Land Management (“BLM”) take down road signs it had placed inside federal lands. (Majority Op. 1165-66.) This is a generous reading of the verb “to request,” which generally implies permission or at least some level of deference. In its March 2003 letter, Kane County declared in no uncertain terms that BLM road signs violated “county policy” and constituted an “intrusion against the rights of the dominant estate.” Although acknowledging the existence of the federal land management plan closing certain roads to off-highway vehicle travel, the County demanded that BLM take down its signs “within a timely period of sixty days” and insisted that BLM management “instruct” its employees not to give the public “verbal misinformation” *1182 that the claimed roads were closed to off-highway vehicle use. Near the end of its letter, the County expressly stated its intention to pass an ordinance opening the disputed roadways to “[all-terrain vehicle] and motorcycle travel.”
Five months later, despite ongoing negotiations over the disputed roads, Kane County sent a letter to BLM quixotically declaring the road signs to be in violation of state law. It threatened fines and “the recovery of costs and expenses” for removal of the signs if BLM did not take them down promptly. Around this same time, the County unilaterally removed approximately thirty BLM road signs restricting off-highway vehicle travel on federal lands. The “return” of the signs, left outside a BLM office, was accompanied by a threatening letter.
Approximately a year and a half later, Kane County began a program of erecting its own signs on the disputed roadways. These signs opened the disputed routes to all forms of off-highway vehicle use. According to the plaintiffs, Kane County placed 268 signs on BLM lands, including 103 inside the Grand Staircase-Esealante National Monument, at least sixty-three of which purported to open routes to off-highway vehicle travel otherwise restricted by the federal land management plan. It was only after posting its signs that the County decided to pass an ordinance authorizing its actions. Moreover, the County’s eventual decision to remove “some” of its signs “pending consideration of the roads’ status and uses” and rescind its ordinance was based on its conclusion that doing so would help it to “secure the most successful legal resolution to current federal roads litigation.”
Contrary to the majority’s fanciful tableau of serenity and goodwill, the situation at the time the plaintiffs filed suit was chaotic and hostile. The County declared an all-terrain vehicle “vroom-vroom” free-for-all on lands within the Grand Staircase-Esealante National Monument, wilderness areas, and other protected federal lands in direct contravention of federal management plans. If anything, the district court’s adjudication of the issues presented in this case is commendable for its prudent judgment.
II
The majority’s understanding of the parties’ positions and posture is simply wrong. Plaintiffs brought this case to enjoin a preempted local ordinance that was harming their aesthetic and recreational interests. That ordinance conflicted directly with federal regulations banning off-highway vehicle use on protected federal lands. Instead of addressing plaintiffs’ actual claims, the majority recasts this entire case as a dispute over property rights, allowing it to conclude that plaintiffs were asserting the United States’ interests rather than their own. But although the majority may enjoy the power of its own opinion, it does not have the power to select the facts, and as a factual proposition, title of the United States to the property at issue was never properly challenged.
Beyond the majority’s peculiar alchemy in converting the case argued below into the one which produces its favored outcome, today’s opinion is even more fundamentally troubling. Recasting this case as a property dispute displays a clear misapprehension of the manner in which federal property rights may be challenged and the extent of federal authority over claimed R.S. 2477 rights-of-way.
A
Rehearing in this case was granted to reconsider, and the parties were asked to *1183 brief, numerous issues.[1] The original panel’s ruling on four of those issues is left unaddressed. The only holding announced today relates to prudential standing — a topic to which the County devoted five paragraphs of its 120 pages of briefing on appeal.
In deciding this case on prudential standing, the majority distorts plaintiffs’ claims beyond all recognition. Plaintiffs’ complaint states a straightforward Supremacy Clause claim. They allege that Kane County’s “passage of Ordinance 2005-3 and the destruction of BLM signs and erection of County route signs on BLM lands[] conflicts with federal statutes and regulations.” Yet the majority refuses plaintiffs the right to state their own claims. Rather than consider the preemption case that was pled, litigated, and decided, the majority decrees that this case is “essentially a property dispute between two landowners.” (Majority Op. 1171.) This announcement will certainly come as a surprise to the plaintiffs, who never advanced such a case, and to the district court that never decided such a ease.
But in its haste to recast this case to more neatly fit into a predetermined narrative, the majority overlooks the fact that this case could not possibly decide any property rights and thus could not possibly be a mere “property dispute between two landowners.” (Id.) As the district court repeatedly stressed below, this case does not require “any final determination regarding the existence of any R.S. 2477 right-of-way in order to grant [plaintiffs’] requested relief.” This is so because “the County ha[d] not filed a quiet title action.” The district court properly tailored its relief in light of these principles, prohibiting “those County road signs that conflict with federal land management plans or federal law as identified in this Order.” Instead of determining Kane County’s property rights vis-a-vis the United States, the district court enjoined similar violations of federal law “unless and until Kane County proves in a court of law that it possesses a right-of-way to any such route.”
Astonishingly, the majority both disregards plaintiffs’ claims and overlooks the district court’s holding. Instead of considering plaintiffs’ actual assertion of their legal interests and reviewing the injunction that was entered to vindicate those interests, the majority baselessly insists that plaintiffs “obviously seek[ ] to enforce the federal government’s property rights” and that their “claims turn on the superiority of the federal government’s property claim.” (Majority Op. 1171.) These assertions are peculiar in light of the procedural history of this case; The district court clearly entered a final judgment without determining the validity of any property rights. Like the panel dissent, the en banc majority chooses to ignore the actual case decided below, and writes as if the *1184 plaintiffs were required to establish the superiority of the United States’ title to the disputed R.S. 2477 rights-of-way.
B
This is not a property-rights case, and the district court properly recognized that the United States’ property rights were never placed at issue. To decide this case, there are only five essential points:
1. Federal law is “the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” U.S. Const, art. VI, cl. 2.
2. The Grand Staircase-Escalante Management Plan, which governs the majority of the area at issue, states: “Any route not shown on Map 2 is considered closed upon approval of this plan, subject to valid existing rights.” It then clarifies, that “[i]f claims are determined to be valid R.S. 2477 highways, the Approved Plan will respect those as valid existing rights. Othenuise, the transportation system described in the Approved Plan will be the one administered in the Monument.” Grand Staircase-Escalante National Monument Management Plan 46 & n.1 (emphasis added).[2] As recounted in the panel majority opinion, the other applicable management plans similarly bar off-highway vehicle use. See Wilderness Soc’y, 581 F.3d at 1224-26.
3. Kane County passed an ordinance and engaged in a signage program opening roads that the applicable federal management plans ordered closed to off-highway vehicles.
4. The QTA is “the exclusive means by which adverse claimants [may] challenge the United States’ title to real property.” Block, 461 U.S. at 286, 103 S.Ct. 1811 (footnote omitted).
5. Kane County concedes that it has not successfully challenged the United States’ title to any of the lands at issue in a QTA claim.
None of these steps “turn on the superiority of the federal government’s property claim.” (Majority Op. 1171.) Whether Kane County asserts or possesses valid R.S. 2477 rights is irrelevant to the preemption issue at hand.[3] Instead, as the district court recognized, the dispositive question is whether Kane County has successfully challenged the United States’ claim to the lands at issue in a suit under the QTA. It is undisputed that the County has not done so. Accordingly, there is no property dispute involved in this case. It is that simple.
Once the “United States claims an interest” in land, 28 U.S.C. § 2409a(a), there is one way — and only one way — to disturb *1185 federal possession: by bringing a QTA suit. Block, 461 U.S. at 286, 103 S.Ct. 1811. Were this not so, litigants could easily avoid Congress’ “carefully crafted provisions of the QTA deemed necessary for the protection of the national public interest.” Id. at 284, 103 S.Ct. 1811. Our court has previously applied the Block rule to bar R.S. 2477 claims unless brought pursuant to the QTA. Sw. Four Wheel Drive Ass’n v. BLM, 363 F.3d 1069, 1071 (10th Cir.2004); see also Sw. Four Wheel Drive Ass’n v. BLM, 271 F.Supp.2d 1308, 1310 (D.N.M.2003) (district court decision clarifying that the “roads” at issue were claimed R.S. 2477 rights); cf. Kinscherff v. United States, 586 F.2d 159, 161 (10th Cir.1978) (“Easements are real property interests subject to quiet title actions.”).
On the record before us, there is no doubt that the federal government claims an interest in the lands at issue. Not only did federal agencies institute management plans closing the roads at issue to off-highway vehicle use, federal authorities also posted signs on various claimed rights-of-way prohibiting off-highway vehicle travel. See Park Cnty., Montana v. United States, 626 F.2d 718, 721 (9th Cir. 1980) (posting of “Motor Vehicles Prohibited” sign by federal agency sufficient to claim an interest in alleged right-of-way).[4] Accordingly, the United States is entitled to possession of that land, and the concomitant regulatory authority that comes with possessory rights, unless and until a claimant brings and wins a QTA claim. Although there are indeed other means of recognizing R.S. 2477 rights in certain circumstances, see Wilderness Society, 581 F.3d at 1221, there is only one way to challenge title once the United States has claimed an interest in an alleged right-of-way (for example, by posting signs banning off-highway vehicle travel, see Park County, 626 F.2d at 721), and that is the QTA.[5] The majority conflates these distinct concepts in asserting that the QTA “does not, nor could it, purport to be the exclusive means of recognizing R.S. 2477 rights.” (Majority Op. 1173.) When the United States claims an interest in land, as in this case, the QTA can and does provide the exclusive avenue to challenge that claim.
Despite the majority’s aspirations to the contrary, there is no R.S. 2477 exception to the Block rule, as the Seventh and District of Columbia Circuits have recognized. In Shawnee Trail Conservancy v. U.S. Department of Agriculture, 222 F.3d 383 (7th Cir.2000), plaintiffs alleged that the U.S. Forest Service lacked the authority to designate certain federal lands as Research Natural Areas based on alleged but unproven rights-of-way. Id. at 385. “Be *1186 cause the plaintiffs did not bring their claim under the QTA,” the district court held that it “could not consider the issue of title to the land.” Id. at 386 (emphasis added). Affirming that conclusion, the Seventh Circuit held that allowing non-QTA challenges to federal land claims would “allow parties to seek a legal determination of disputed title without being subject to the [QTA] limitations placed on such challenges.” Id. at 388. Similarly, in Montanans for Multiple Use v. Barbouletos, 568 F.3d 225 (D.C.Cir.2009), a group of citizens and organizations attempted to challenge the Forest Service’s closure of various roads and trails by claiming that the closures violated the “valid existing rights” language in the Federal Land Management Policy Act, Pub.L. No. 94-579, § 701(h), 90 Stat. 2743. See Montanans for Multiple Use, 568 F.3d at 228. The court quickly recognized that plaintiffs were merely attempting to dodge the QTA: “The upshot is that plaintiffs are necessarily challenging the United States’ title to the lands. But such a claim must proceed under the [QTA].” Id. at 229. Because plaintiffs did not invoke the QTA, their argument was rejected. Id.
In line with Shawnee Trail Conservancy and Montanans for Multiple Use, the district court refused to permit Kane County to evade the requirements of the QTA. It noted that Kane County sought to prove up its R.S. 2477 claims, but correctly held that “this case is not the proper forum for such a determination” because “the County has not filed a quiet title action.” The majority appears to fault the district court for this unassailable holding. (See Majority Op. 1167 (“[The court] declined to allow the County to establish the validity of its R.S. 2477 rights before deciding the merits.”).) Although the majority attempts to back away from its primary holding by claiming that it does not violate Block, (Majority Op. 1173-74), the majority is openly hostile to the unassailable conclusion that Kane County cannot challenge the United States’ claim to public lands outside of a QTA claim and that “absent participation and victory in that quiet title action, the R.S. 2477 claimant loses.” (Majority Op. 1173.) To the contrary, the majority holds, there are “several other mechanisms for resolving such disputes.” (Id.) This holding is in direct contravention of Block, which unambiguously holds that the QTA is “the exclusive means by which adverse claimants [may] challenge the United States’ title to real property.” 461 U.S. at 286, 103 S.Ct. 1811 (footnote omitted, emphasis added).
Despite the majority’s claim that plaintiffs’ case rests on the disputed third party property rights of the United States and “seeks to vindicate the property rights of the federal government,” (Majority Op. 1165), those rights needed no vindication; they were never put in doubt. Kane County elected not to file a QTA claim against the United States as required to meet its burden of proving any R.S. 2477 rights. Consequently under United States Supreme Court precedent, Block, 461 U.S. at 286, 103 S.Ct. 1811 — reaffirmed by multiple circuits — Kane County never viably challenged the United States’ interests in the lands at issue. See S. Utah Wilderness Alliance v. BLM, 425 F.3d 735, 768-69 (10th Cir.2005) (holding that parties seeking to enforce rights-of-way against the federal government, including R.S. 2477 rights, bear the burden of proving those claims. If there are any doubts, “they are resolved for the Government, not against it.” (quoting Watt v. W. Nuclear, Inc., 462 U.S. 36, 59, 103 S.Ct. 2218, 76 L.Ed.2d 400 (1983))).
But today’s majority decision holds that the United States’ property rights were at issue despite this fundamental defect and that this case must be dismissed on pru *1187 dential standing grounds. To reach its conclusion, the majority necessarily has held the United States may be stripped of its property rights outside a QTA claim, and thereby creates a circuit split with Shawnee Trail Conservancy and Montanans for Multiple Use.
C
Further compounding its error, the majority fails to recognize that the Property Clause of the United States Constitution, art. IV, § 3, cl. 2, undermines its analysis. The majority attempts to recast this case as one based on disputed property rights to justify its conclusion that the plaintiffs are claiming rights that actually belong to the United States. To support this judicial artifice, the majority apparently assumes that the federal government lacks authority to ban off-highway vehicle use through protected federal lands if Kane County’s alleged R.S. 2477 rights are valid. Under the majority’s construction, if the United States has title, then Kane County’s regulation is preempted and plaintiffs prevail; if title belongs to Kane County, plaintiffs’ preemption argument fails and they lose. Either way, asserts the majority, plaintiffs’ claims “turn on the superiority of the federal government’s property claim.” (Majority Op. 1171.) But the majority’s argument rests on a false dichotomy: Putting aside the QTA issue, even validly adjudicated R.S. 2477 rights-of-way are not free from federal regulation. The property dispute, even if it were resolved, cannot be dispositive.
As our court held in United States v. Jenks, 22 F.3d 1513, 1517-18 (10th Cir. 1994), easements over federal land remain subject to reasonable federal regulation. See also S. Utah Wilderness Alliance, 425 F.3d at 746-48 (recognizing R.S. 2477 rights-of-way as easements subject to federal regulation). Citing Kleppe v. New Mexico, 426 U.S. 529, 96 S.Ct. 2285, 49 L.Ed.2d 34 (1976), the Sixth Circuit has held that the Property Clause is “sufficiently broad to authorize Congressional regulation of private-property interests that are also located on public land,” including “private property rights in easements over the public land.” Burlison v. United States, 533 F.3d 419, 432-33 (6th Cir.2008). The Ninth Circuit has repeatedly upheld the federal government’s authority to regulate R.S. 2477 rights-of-way that traverse protected federal lands. See Clouser v. Espy, 42 F.3d 1522, 1538 (9th Cir.1994); United States v. Vogler, 859 F.2d 638, 642 (9th Cir.1988). The same is true of district courts in our own circuit. See United States v. Garfield Cnty., 122 F.Supp.2d 1201, 1240-41 (D.Utah 2000); Wilkenson v. Dep’t of Interior, 634 F.Supp. 1265, 1280 (D.Colo.1986).
The fact that the United States may regulate even valid rights-of-way further undermines the majority’s recasting of this case as one based on disputed property rights. Even if Kane County had successfully established the validity of its claimed rights-of-way by bringing a QTA action, the preemption issue would remain. The notion that the outcome of this case turned on a credible property-rights claim is quite clearly mistaken.
Ill
Having radically reconstructed plaintiffs’ case, the majority holds that a defendant whose preempted action injures another may rob plaintiffs of prudential standing simply by challenging the United States’ authority to regulate. But in ruling that the plaintiffs’ claims rest on the “rights” of a third party, the majority misunderstands the doctrine of prudential standing as well.
The branch of prudential standing misapplied by the majority was first discussed by the Supreme Court in Warth v. Seldin, *1188 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). In that case, certain residents of Rochester, New York, and an organization representing their interests filed suit under 42 U.S.C. § 1983, alleging that a nearby suburb, Penfield, effectively excluded low- and moderate-income residents through its zoning code. Id. at 493-94, 95 S.Ct. 2197. One group of plaintiffs alleged that this zoning scheme caused them to pay higher taxes because the low-income residents were forced to live in Rochester. Id. at 508-09, 95 S.Ct. 2197. The Court noted that a “plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.” Id. at 499, 95 S.Ct. 2197. It further explained that “[essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiffs position a right to judicial relief.” Id. at 500, 95 S.Ct. 2197 (footnote omitted). As applied to the taxpayer-plaintiffs, the Court ruled that they were merely alleging “that Pen-field’s zoning ordinance and practices violate the constitutional and statutory rights of third parties, namely, persons of low and moderate income who are said to be excluded from Penfield.” Id. at 509, 95 S.Ct. 2197. Because no statute “grant[ed] a right of action, and thus standing to seek relief, to persons in petitioners’ position,” the Court dismissed their claims. Id. at 510, 95 S.Ct. 2197.
Warth is best understood as holding that § 1983 does not provide a private right of action to remedy violations of the constitutional rights of others. Grappling with a nascent doctrine, the Court articulated the lack of a “right of action” as a “standing” issue. 422 U.S. at 510, 95 S.Ct. 2197. However, the Court has clarified in the years following Warth that the existence of a cause of action (sometimes called “statutory standing”) must not be confused with jurisdictional matters. See Steel Co. v. Citizens for a Better Env’t, 523 U.S. 83, 95-97, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); see also Dohaish v. Tooley, 670 F.2d 934, 936-37 (10th Cir.1982) (“It is not unusual for standing and the cause of action based on violation of civil rights to be confused.”).
Unlike the plaintiffs in Warth, the plaintiffs at bar “have a valid right of action under the Supremacy Clause.” Chamber of Commerce of the U.S. v. Edmondson, 594 F.3d 742, 756 n. 13 (10th Cir.2010); see also Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir.2004) (“A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action.”). The Supreme Court recently reaffirmed the principle that citizens possess “an implied private right of action directly under the Constitution to challenge governmental action,” noting that “equitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.” Free Enter. Fund v. Pub. Co. Accounting Oversight Bd., — U.S.-, 130 S.Ct. 3138, 3151 n. 2, 177 L.Ed.2d 706 (2010) (quotation omitted).
The cases cited in Warth as creating the third party prudential standing rule clarify how the rule was intended to operate. In Barrows v. Jackson, 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953), the Court held that “one may not claim standing in this Court to vindicate the constitutional rights of some third party,” explaining that the basis for the rule is that a “person cannot challenge the constitutionality of a statute unless he shows that he himself is injured by its operation.” Id. at 255, 73 S.Ct. 1031. Similarly, in Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943), the Court rejected a doctor’s at *1189 tempt to challenge a contraceptives law because he lacked “standing to secure an adjudication of his patients’ constitutional right to life, which they do not assert in their own behalf.” Id. at 46, 63 S.Ct. 493.
These cases stand for the uncontroversial proposition that one may not sue based on violations of a third party’s rights or legal interests. Although the “rights” language worked well enough in Worth given that it was a § 1983 claim (and thus dependent upon a deprivation of rights), the prudential standing limitation is based on a party’s inability to bring claims that actually belong to a third party. That understanding is confirmed by Sprint Communications Co. v. APCC Services, 554 U.S. 269, 128 S.Ct. 2531, 171 L.Ed.2d 424 (2008), which discussed “certain prudential limitations that we have imposed in prior cases where a plaintiff has sought to assert the legal claims of third parties.” Id. at 289, 128 S.Ct. 2531 (emphasis added); see also Dennis v. Higgins, 498 U.S. 439, 447 n. 7, 111 S.Ct. 865, 112 L.Ed.2d 969 (1991) (defining “right” as a “legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act” (quotation omitted, emphasis added)).
In Worth, plaintiffs were seeking to bring a claim that properly belonged to the individuals whose rights were violated. 422 U.S. at 509-10, 95 S.Ct. 2197. In Tileston, the Court rejected a doctor’s due process claim because the patients whose lives were endangered were the proper litigants. 318 U.S. at 46, 63 S.Ct. 493. In Barrows, the question was whether white homeowners could rely on the violation of the rights of potential non-white buyers in a racial covenant case. 346 U.S. at 254-55, 73 S.Ct. 1031. Other cases cited by the majority confirm the claim-focused nature of the prudential standing limitation. See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 17, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004) (father’s claim challenging school recitation of Pledge of Allegiance belonged to daughter or parents acting in concert); Singleton v. Wulff, 428 U.S. 106, 113-15, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976) (partial plurality opinion) (considering whether doctor’s challenge to ban on abortion funding belonged to patients).
Although the Court has admittedly used the terms “rights,” “interests,” and “claims” in a seemingly interchangeable manner in the context of § 1983 claims, there exists a firmly rooted analytical distinction between causes of action based on the violation of individual rights under § 1983 and those that arise directly under the Constitution based on the structure of government. See White Mountain Apache Tribe v. Williams, 810 F.2d 844, 849 (9th Cir.1987). As a framer of § 1983 noted,
prohibitions upon the political powers of the States are of such a nature that they can be ... enforced by the courts of the United States declaring void all State acts of encroachment on Federal Powers.... But there are some that are not of this class. These are where the court secures the rights or liabilities of persons within the States, as between such persons and the States.
White Mountain Apache Tribe, 810 F.2d at 849 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) (statement of Representative Shellabarger)). One may shift between the terms “rights” and “claims” when the plaintiffs claims assert the violation of an individual right, but one may not sensibly describe the plaintiffs here as asserting the “rights” of the United States against an exertion of power by Kane County. In accurate terms, the plaintiffs are seeking to halt “State acts of encroachment on Federal Powers,” id., as are all preemption claimants.
*1190 The third party prudential standing limitation is designed to ensure plaintiffs are suing because they themselves have been injured and possess a right of action. Plaintiffs in this case meet these requirements. They properly pled the type of recreational and aesthetic injuries repeatedly recognized by the Supreme Court as sufficient for Article III standing. See Summers v. Earth Island Inst., — U.S. -, 129 S.Ct. 1142, 1149, 173 L.Ed.2d 1 (2009) (“While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice.” (citation omitted)). Moreover, plaintiffs possess a right of action to remedy these injuries because a “party may bring a claim under the Supremacy Clause that a local enactment is preempted,” Qwest, 380 F.3d at 1266; see Chamber of Commerce, 594 F.3d at 756 n. 13; see also Free Enter. Fund, 130 S.Ct. at 3151 n. 2.
The majority’s description of the United States’ authority to promulgate regulations as a “right” is unusual. Defendants often assert that a preemptive federal enactment is somehow invalid in response to a preemption claim. See, e.g., Lindsey v. Tacoma-Pierce Cnty. Health Dep’t, 195 F.3d 1065, 1075 (9th Cir.1999) (local government body argues federal statute exceeds Congress’ power under the Commerce Clause in response to preemption claim). Mere assertion of such a defense does not demand dismissal.[6] If it did, the Supremacy Clause would be a dead letter: Every preemption claim rests on the authority of the United States. But prudential standing does not vitiate the Supremacy Clause; it simply demands that plaintiffs seek redress for their own injuries under their own causes of action.
Contrary to the majority’s assertion, neither plaintiffs’ injury nor their right to sue under the Supremacy Clause belongs to the United States. As for the injury to plaintiffs’ aesthetic and recreational interests, the majority does not suggest that the United States actually suffered this injury. Rather, the majority simply discounts their injuries because they are “indistinguishable from TWS’s argument for constitutional standing.” (Majority Op. 1171.) But a party’s injuries for constitutional and prudential standing will always align, and, as the analysis in Worth indicates, the two are often difficult to disaggregate. See 422 U.S. at 499-500, 95 S.Ct. 2197 (describing prudential standing as “closely related to Article III concerns”); see also Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 80-81, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978) (“Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met.”). There is not a heightened injury requirement in the prudential standing analysis; the majority prohibits plaintiffs from obtaining relief for their injuries based on its conclusion that their claim should have been brought by the United States. Yet a government cannot suffer an aesthetic or recreational injury in its own right, even if it may seek to protect those interests on behalf of its citizens.
*1191 Nor does the plaintiffs’ cause of action belong to the United States. Plaintiffs “have a valid right of action under the Supremacy Clause.” Chamber of Commerce, 594 F.3d at 756 n. 13; see also Qwest, 380 F.3d at 1266. This is a right that plaintiffs possess as parties injured by the operation of a preempted local ordinance. It is not based on a generalized grievance “shared in substantially equal measure by all or a large class of citizens,” Warth, 422 U.S. at 499, 95 S.Ct. 2197; it is one enjoyed by the relatively small number of individuals who have been injured by Kane County’s preempted activities. The United States may also possess standing to bring a preemption claim against Kane County. See United States v. Colo. Supreme Court, 87 F.3d 1161, 1165 (10th Cir.1996) (United States has standing to bring preemption claim if it demonstrates actual injury). However, that right of action would seek relief for different injuries to a different party. The fact that more than one party possesses standing to bring a Supremacy Clause challenge does not rob any of those parties of the right to sue. See Pub. Citizen v. U.S. Dep’t of Justice, 491 U.S. 440, 449-50, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) (“The fact that other citizens or groups of citizens might make the same complaint ... does not lessen [the] asserted injury.”).
According to the majority, “other governmental institutions may be more competent to address the questions” presented by this case. (Majority Op. 1168-69 (quoting Warth, 422 U.S. at 500, 95 S.Ct. 2197).) Yet again, the majority blithely ignores the legal framework established by Congress. If the majority is referring to property-rights issues — which were never in play, see Part II, supra — only federal courts may decide a QTA claim. 28 U.S.C. § 1346(f) (“The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States.”). Congress has prohibited federal agencies from issuing final determinations of R.S. 2477 claims. See Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104-208, § 108, 110 Stat. 3009, 3009-200 (1996) (“No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act.”).
Despite its claim that the political branches may be better suited to resolve this case, the majority finds it appropriate to speak for the BLM. It declares that the agency “does not wish to assert its rights against Kane County at this time or in this fashion.” (Majority Op. 1172.) Yet again, the majority ignores the background of this case. The BLM objected to Kane County’s actions before this suit was filed. It was also briefly a party to this case below, and was thus clearly aware of the issues involved. But the agency did nothing after the district court entered its injunction or after the panel majority affirmed the district court. The majority interprets this silence as a clear denunciation of plaintiffs’ claims, but if the BLM opposes the injunction that was entered by the district court and affirmed on appeal— as the majority divines — it has chosen a strange way to express its disagreement. The BLM’s silence is just as easily interpreted as acquiescence to the plaintiffs’ actions than as opposition to them.
The majority confuses the rights and interests at issue in this case. To the extent that the United States has any “right” related to this dispute, it would be its authority to regulate. All preemption claims rest on that authority. The major *1192 ity opinion poses a real threat to the availability of relief for those injured by unconstitutional state action. This court received numerous briefs from amici with diverse interests urging us not to strip away the longstanding ability of plaintiffs to seek relief from unconstitutional state regulation under the Supremacy Clause. Although the majority does not do so in explicit terms, it holds that a mere challenge to federal authority — no matter how frivolous — is sufficient to destroy such plaintiffs’ right of action.[7]
IY
The concurrence in judgment would also vacate the district court’s injunction, but would do so on somewhat different bases. (Concurring Op. 1174-75.) It would hold that much of plaintiffs’ challenge has become moot, (id. at 1174-75), and that plaintiffs lack standing over the remainder because their injuries are not redressable, (id. at 1176). I wish to briefly address the concurrence’s reasoning.
A
With respect to mootness, the concurrence mistakenly concludes that there is no evidence that Kane County will resume its unlawful activity. (See Concurring Op. 1175-76.) The record reveals substantial evidence of such intent. First, the minutes of the meeting at which the County rescinded the ordinance state that the action was taken “in order to secure the most successful legal resolution to current federal roads litigation.” This is precisely the type of strategic manipulation of district court jurisdiction the voluntary cessation doctrine is intended to preclude. See City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n. 1, 121 S.Ct. 743, 148 L.Ed.2d 757 (2001) (the voluntary cessation doctrine “traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior”).
Second, a County press release announcing the rescission stated that the decision was made because litigating the ordinance simultaneously with the ownership of the roads “is too big a bite of the apple at one time.” (Emphasis added.) A County Commissioner similarly testified that it was not his “intention to reenact [another ordinance] right away.” (Emphasis added.) The Commissioner stated that the County had a “full plate” between “litigation on roads and grazing and public land planning issues.” When asked whether he continued to believe the County possessed authority to allow off-highway vehicles on roads lying -within federal land (at a time when the County had not prevailed in any QTA action), the Commissioner answered, ‘Yes.” These statements belie the benign intent attributed to Kane County by the concurrence, which suggests the County intended to place signs and enact another ordinance only after a determination of its R.S. 2477 claims. (See Concurring Op. 1175-76.)
*1193 Third, even after the ordinance was rescinded, Kane County refused to remove many of its signs from disputed routes. When asked whether those remaining signs signified a right-of-way open to vehicles, a County Commissioner testified that the signs “identify a road as a county road, which by definition is a public highway, which would therefore be open to public travel.”[8] Up until the very moment the district court entered its injunction, Kane County persisted in its unlawful actions. See Wilderness Soc’y v. Kane County, 560 F.Supp.2d 1147, 1156 (D.Utah 2008). This course of action demonstrates “reluctant submission by governmental actors and a desire to return to the old ways.” See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096, 1117 (10th Cir. 2010) (quotation and alteration omitted).
This brings me to my second disagreement with the concurrence’s mootness analysis. Despite its claim that four years have passed since the ordinance was repealed, the relevant time period is much shorter because Kane County was enjoined from passing a similar ordinance during most of the timeframe cited. Compliance with an injunction during the pendency of an appeal obviously does not render the appeal moot. See Bell v. Wolfish, 441 U.S. 520, 542 n. 25, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); cf. NLRB v. King Soopers, Inc., 476 F.3d 843, 845-46 (10th Cir.2007). If it did, we would lack the power to review injunctions entered by the district courts absent non-compliance by the appellant.
In the context of rescinded statutes our circuit precedent holds that a case is not moot unless “it can be said with assurance that there is no reasonable expectation that the alleged violation will recur.” Rio Grande Silvery Minnow, 601 F.3d at 1115. The foregoing facts demonstrate this standard has not been met, especially in light of the fact that Kane County persisted in the challenged actions until the threat of contempt forced it to halt.
B
As to its standing analysis, the concurrence acknowledges that the posting of Kane County signs on federal lands remains a live dispute, but would hold that plaintiffs lack standing to challenge the County’s signage program because the injury is not redressable under the Supremacy Clause. (Concurring Op. 1177-79.) This analysis suffers two flaws.
First, the concurrence makes the unfortunate error of conflating standing and the merits. See Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1256 (10th Cir.2004) (“[W]e must not confuse standing with the merits.”). According to the concurrence, plaintiffs’ injuries are not redressable because the County’s signage program proceeds under federal law and thus there are no “County laws or actions inconsistent with federal law” to be enjoined under the Supremacy Clause. (Concurring Op. 1177.) But this is simply an assertion that the plaintiffs’ Supremacy Clause claim fails on the merits. “For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiffs asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing.” Initia *1194 tive & Referendum Inst. v. Walker, 450 F.3d 1082, 1092 (10th Cir.2006).
The redressability analysis does not ask whether plaintiffs can obtain the relief they request under their theory of the case, as the concurrence would have it. Instead, the questions is simply whether “it is likely and not merely speculative that the plaintiffs injury will be remedied by the relief plaintiff seeks in bringing suit.” Sprint Commc’ns Co., L.P., 554 U.S. at 273-74, 128 S.Ct. 2531 (quotations omitted); see also Initiative & Referendum Inst., 450 F.3d at 1098 (“[R]edressability [is] the requirement that a favorable judgment would meaningfully redress the alleged injury.”).
Plaintiffs have established redressability under the proper standard. The injunction they sought, and fleetingly obtained, was likely to at least somewhat redress the injuries alleged to plaintiffs’ aesthetic and recreational interests. See Larson v. Valente, 456 U.S. 228, 243, n. 15, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982) (“[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury.”). Contrary to the hypothetical injunction to which the concurrence references, (Concurring Op. 1178), plaintiffs sought “an injunction ordering Kane County to remove its County signs from federal public lands.” And the actual injunction plaintiffs obtained below required Kane County to “remove those signs indicating as open those routes closed under federal land management plan[s] or federal law.” Wilderness Soc’y, 560 F.Supp.2d at 1166. In conducting the redressability inquiry, we ask only whether the “relief plaintiff seeks” would redress the injury. Sprint Commc’ns Co., L.P., 554 U.S. at 273-74, 128 S.Ct. 2531 (quotations omitted). Whether the concurrence would grant the relief requested is utterly irrelevant to the redressability analysis.
In the same breath that it criticizes the district court’s ruling and indicates its contrary view on the merits of plaintiffs’ Supremacy Clause challenge, the concurrence asserts that the dissent fails to identify “any merits question I decide against the [plaintiffs].” (Concurring Op. 1179 n.3.) But of course, the concurrence would decide that plaintiffs’ Supremacy Clause challenge fails on the merits — it would deny plaintiffs the relief they request. The concurrence fleetingly recognizes that “whether a favorable judgment on the plaintiffs cause of action asserted would redress the plaintiffs claimed injuries” is the proper analysis, (id.), but adopts a curious definition of “favorable judgment.” In its view, a favorable judgment is not the requested injunction, but rather whatever relief is available in light of the concurrence’s view of the merits. But the Supreme Court has been abundantly clear that the “relief plaintiff seeks,” Sprint Commc’ns Co., L.P., 554 U.S. at 273-74, 128 S.Ct. 2531, is the locus of the redressability analysis; not the relief a judge might deem appropriate.
The second problem with the concurrence’s standing analysis is its assertion that Kane County’s signage program constitutes enforcement of federal law. (Concurring Op. 1178.) R.S. 2477 is merely a federal land grant, see S. Utah Wilderness Alliance, 425 F.3d at 769; it did not deputize counties into the federal law enforcement apparatus. Regulation of an asserted county highway does not constitute enforcement of federal law merely because title was allegedly granted by a federal statute. We would not suggest, for example, that a local school was somehow enforcing federal law simply because it was built on a parcel provided for by a federal land grant. Cf. Dist. 22 *1195 UMW of Am. v. Utah, 229 F.3d 982, 988 (10th Cir.2000) (discussing federal land grants for schools).
Moreover, the ordinance itself explicitly noted that Kane County claims authority to designate roads pursuant to state law, specifically Utah Code §§ 41-22-10.1 and -10.5, which allow Utah Counties to designate roadways by posting signs. And, as noted above, even after the ordinance was rescinded, the County continued to claim that its signs opened rights of way to the public. The provisions of the Utah Code make clear the County’s authority to regulate the Class B and D roads at issue. See Utah Code §§ 72-3-103, -105. Kane County officials were not enforcing any provisions of federal law, nor was the County acting as a private landowner might. (See Concurring Op. 1178.) Instead, it was utilizing its authority under Utah state law to open roads despite conflicting federal management plans. Such action can, and should, be proscribed by way of a Supremacy clause challenge. But this disagreement goes to the merits of plaintiffs’ claims, not to their standing. And because Kane County never advanced this argument, it is not before the en banc court in any event.
V
Today’s decision will work untold mischief. Operating under the district court’s injunction, Kane County and the United States have begun the orderly process of determining the validity of R.S. 2477 rights in the only manner permissible under federal law — through the QTA. See Kane Cnty. v. United States, 597 F.3d 1129, 1130 (10th Cir.2010) (discussing QTA case filed by Kane County in 2008). But because the majority holds that the United States’ claim to land may be imperiled outside the QTA context, and effectively reverses the presumption of federal authority over federal lands, Kane County now has no reason to continue down this road. The majority grants it, and every other state and local government in the circuit — which for these purposes regrettably includes Yellowstone National Park, all of which lies within our jurisdiction — a green light to flout federal law. Although this sort of lawlessness may play well in a wild-west style fantasy, the majority’s decision causes real and serious harm to the litigants, to the United States, and to the responsible residents of the affected communities seeking a resolution to this apparently interminable dispute.

. Those issues are:
1) Whether the Plaintiffs have constitutional standing, i.e., whether the Plaintiffs have a "legally protected interest” and prudential standing;
2) Whether the Supremacy Clause provides the Plaintiffs with a private right of action;
3) Whether a local government may exercise R.S. 2477 rights over federal lands in a manner that conflicts with the federal management regime without filing a Quiet Title Act suit with respect to those rights;
4) Whether a local government may assert R.S. 2477 rights defensively without seeking to join the landowner in the action; [and]
5) Whether this matter is moot in light of, among other things, Kane County’s decision to rescind its ordinance and remove the relevant road signs.
(Order of Feb. 5, 2010.)

. In its recounting of the facts of this case, the majority opinion quotes this regulation, but substitutes ellipses for the determinative emphasized sentence. (Majority Op. 1166.) This omission is glaring.

. The majority claims that this dissent is driven by skepticism as to the validity of the County’s R.S. 2477 claims. (Majority Op. 1172-73.) This claim is baseless; as clearly stated here and repeatedly emphasized in the panel majority, it simply does not matter whether the County has legitimate claims because it opted not to follow the necessary procedural steps. See Wilderness Soc’y, 581 F.3d at 1218 n. 12 (”[T]he district court went to great lengths to make clear it was not determining the validity of the County’s claims to R.S. 2477 rights.”); id. at 1219 ("Because a Quiet Title Act claim was not filed in this case, the validity of purported R.S. 2477 rights of way over federal land could not have been adjudicated.”) (footnote omitted); id. at 1224 n. 22 ("While we acknowledge that R.S. 2477 rights may well have vested without procedural formalities, as did the district court, we do not pass on the validity of such rights.” (citation omitted)).

. The majority contends that the government's right to regulate "necessarily entails the discretion of the United States as a property owner.” (Majority Op. 1174.) But it fails to acknowledge that the United States exercised its discretion by posting signs closing routes to off-highway vehicle use.

. The majority ignores this distinction in asserting that the position of the dissent would be unchanged "even if the government and Kane County agreed about the nature and extent of an R.S. 2477 easement.” (Majority Op. 1173.) Again, this is a mischaracterization. As the district court stressed, its ruling applies only to signs posted in "conflict with federal land management plans or federal law as identified in [its] Order.” That limited holding was affirmed by the panel majority. See Wilderness Soc’y, 581 F.3d at 1222 n. 19 ("We must decide the [the issue presented] only in the case of a conflict.”). If the United States did not claim an interest in the alleged R.S. 2477 rights, there would be no preempting federal rule upon which to base such a challenge. Moreover, the QTA applies only if the United States "claims an interest” in land. 28 U.S.C. § 2409a(a). The majority's hypothetical state of agreement would present an entirely different case.

. The majority claims that permitting plaintiffs to assert their claim would "force a quiet title action.” (Majority Op. 1173.) To the contrary, it is Kane County’s affirmative defense that the United States lacks title to the property over which it prohibited off-highway vehicle use that required a QTA suit.

. This proposition is especially dangerous given the ubiquity and ostensible lack of merit to many R.S. 2477 claims. See, e.g., Hale v. Norton, 476 F.3d 694, 696 (9th Cir.2007) (claimed R.S. 2477 right-of-way had been abandoned since 1938, "[a]ll of its bridges have washed away, and the effects of vegetation and erosion have reduced it to little more than a trail”); Sarah Krakoff, Constitutional Conflicts on Public Lands: Settling the Wilderness, 75 U. Colo. L.Rev. 1159, 1177-78 (2004) ("Some of Moffatt County's asserted claims run along river bottoms and traverse jagged rocky outcroppings. Similarly, Utah counties have asserted thousands of R.S. 2477 claims, many of which challenge even the most generous definition of 'highway' and some of which — such as slot canyons and slick-rock domes — audaciously mock the term.” (footnotes omitted)).

. The concurrence attempts to conceptually sever the operation of the Ordinance and the posting of road signs by ignoring this testimony. But the posting of county road signs indicates that the routes are open to public travel. Both the ordinance and the signs concern Class B and Class D roads, the latter of which "provide for usage by the public for vehicles with four or more wheels.” See Utah Code §§ 72-3-103, -105.